UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS - WESTERN DIVISION

Civil Action No: 3:17cv30031

JANETTE HERNANDEZ PAGAN, PPA
F.H., a minor,
Plaintiff
v.
CITY OF HOLYOKE, A MUNICIPAL CORPORATION,
Officer THOMAS J. LEAHY, Officer JAMES DUNN,
Officer JABET LOPEZ,
Defendants

**<u>Plaintiff s' Janette Hernandez Pagan, et al, Additional Statement of Material Facts
in Opposition to Defendants' Motion for Summary Judgment</u>**

<u>Material Facts pertinent to FT</u>

1. When FT came in contact with three police officers from the HPD he was 12 years old,
   measured 5' 2" and weighed approximately 110 lbs.  Plaintiff's Complaint at ¶ 14.

2. **Ex. 1** is a fair and accurate copy of FT's deposition transcript.

3. On the evening of February 8, 2014, FT came in contact with Edgar Zayas ("Zayas")
   when his mother asked him to bring his younger brother home from playing basketball.
   When he went looking for his brother he observed Zayas to be in a possession of a gun
   and heard Zayas say that he was going to kill himself. Ex. 1, Dep. Trans. at 9-10.

4. FT was frightened because he knew the gun could hurt someone. Id. at 9.  But FT
   followed Zayas because he thought he could do something to help prevent Zayas from
   hurting himself. Id. at 10.  He repeatedly begged him to drop the gun. Id. at 10-11.

5. Zayas walked with the gun and continued talking to himself. Id. at 14.

6. Another individual, Mr. Jose Rivera ("Rivera") followed them. Id. at 16.  Rivera told FT
   that Zayas was acting crazy and suggested FT walked behind him and take the gun away
   from Zayas. Id. at 16.

7. FT followed Zayas to a bridge in Holyoke where he passed the canal. Id. at 17.

8.  Zayas, began shooting at cars and in the air and FT tried to take cover because he was scared. Id. at 18.

9.  FT continued to follow Zayas because he wanted to help Zayas, Id. at 21.

10. FT observed Zayas approaching the police in a Holyoke bridge and hid behind a wall. Id. at 22.  When this happened FT was a football field away from the police. Id. at 23.

11. FT hid behind a retaining wall because he panicked, was scared and did not know what to do.

12. FT was unarmed and possessed no weapons. Id. at 24.

13. After police tackled Zayas on the bridge and removed the gun from him, FT ran the other way next to a building in the canal area. Police closed in and stopped FT. Id. at 25-26.

14. When the HPD stopped FT, they initially approached him in a cruiser. Officer Leahy shined his cruiser headlights at him, FT stopped and officer Leahy lept out of his police car with his gun pointed at him. Id. at 26.

15. Leahy instructed FT to put up his hands, place them behind his head, and, to get down on his knees. FT complied with all police orders.  Id. at 28.   FT remembered sounds of people walking towards him. Id. at 30.

16. As FT awaited further commands, he felt someone kicking him from behind.  As a result, FT hit the ground.  FT did not remember what happened next until later. Id. 29.

17. His next memory was when he found himself inside of a police cruiser, already handcuffed. Id. 30.  While inside of the police cruiser, he asked officers how did he got into the police cruiser because he was confused. His face felt swollen. Id. at 32-33.

18. FT was initially transported to the police station where he was booked and photographed. Id. at 33.

19. **Ex. 2** is a fair and accurate copy of his color booking photos.

20. FT was transported to the Holyoke hospital by ambulance but does not remember having any conversation with ambulance personnel. Id. at 34.  While in route to the hospital he threw up.

Material facts Jannette Hernandez-Pagan

21. **Ex. 3**  is a fair and accurate copy of Ms. Hernandez-Pagan, deposition transcript, FT's mother.

22. **Ex. 4** is a fair and accurate copy of Ms. Hernandez-Pagan answers to Holyoke's Interrogatories.

23. Ms. Hernandez-Pagan prepared in her Answer to Interrogatories a chronology of medical records of her son.

24. FT was first seen at Holyoke Hospital on 2/8/2014 and was found to have multiple abrasions and contusions in the ear with facial swelling. FT was diagnosed by staff with a concussion with loss of consciousness. A CT scan obtained showed a mild biparietal scalp and soft tissue swelling. <u>See:</u> Interrogatory No. 3.

25. After FT's arrest, Ms. Hernandez-Pagan went to the HPD looking for her son and was told no one had arrested a child. <u>See:</u> Interrogatory No. 10.

26. At the HPD, Ms. Hernandez-Pagan spoke with officer Leahy who told her FT had small scratches in his face in the manner as if he had fallen from a bicycle. Id. at 10.

27. When Ms. Hernandez-Pagan arrived to the Holyoke Hospital, she spoke with Jabet Lopez who apologized to her about what had happened to her son. Jabet Lopez told Ms. Hernandez-Pagan he did not witness FT's arrest. Id.

28. Ms. Hernandez-Pagan observed a large hematoma and injury to FT's left ear. Ms. Hernandez-Pagan took a group of pictures of her son's injuries. Id. at 73.

29. Instead of releasing her son to his mother's custody, FT was brought to a juvenile detention center.

30. On February 9, 2014, Ms. Hernandez-Pagan brought her son to Bay State Medical Center in Springfield. Interrogatory at 3. Doctors diagnosed FT with contusions to his head, face, chest, back and abrasions. He was also diagnosed with a head injury. FT was also found to have a left anterior scalp laceration and a small hematoma on the anterior left scalp.

31. Ms. Hernandez-Pagan brought her son to Bay State Medical Center because he was complaining of abdominal pain and headaches. Dep. Trans. at 82.

32. Ms. Hernandez-Pagan took photographs of FT's injuries after he was released from the juvenile detention center. Trans. 73-76.

33. **Ex. 5** is a fair and accurate copy of photographs of FT injuries taken by Ms. Hernandez-Pagan.

34. Afterwards, FT was treated by clinicians at the Gandara Center for a variety of symptoms.

35. Records from Gandara Health Center show FT was diagnosed with post-traumatic stress disorder, sleeping problems and behavioral changes occurring since his police encounter.

36. FT's counseling treatment is documented in Answers to Interrogatories from approximately April 3, 2014 through April 28, 2016.  See:  Deposition Trans. of Ms. Hernandez-Pagan at 83, 86.  Ms. Hernandez-Pagan also had a pediatric neurology consultation of her son. Id. at 87.

37. FT reported and treated for anxiety and panic attacks.  See:  Interrogatories at 3.

38. In her answer to Interrogatory No. 20,  Ms. Hernandez-Pagan explained: "My son was traumatized by his arrest and by the injuries that were inflicted on him.  As I mentioned earlier my son developed anxiety and serious behavioral issues that are described by medical and psychologist in previous interrogatories.  I had problems with him in school which affected our relationship. Following this incident he became aggressive at home when I attempted to discipline him. He did not want to spend time with me and did not want to go anywhere. He was afraid to go out at times, was afraid to in open spaces and afraid of police. He had to overcome with treatment a lot of obstacles. I have to say that today our relationship is back to normal but it took a long time for things to normalize."

39. In her Answers to Interrogatories, Ms. Hernandez Pagan outlined that her son incurred at least $5,805.39 in medical expenses.

40. **Ex. 6** is a true and accurate copy of an affidavit prepared by Ms. Hernandez-Pagan. Her Affidavit is responsive to a Holyoke Affidavit of Lt. Reyes.

41. Ms. Hernandez-Pagan affirmed that she was introduced to Lt. Reyes of the HPD shortly after her son's arrest,where she requested a copy of his arrest report and complained to the Lieutenant about the use of force and the police actions.

42. Ms. Hernandez-Pagan asserts that at no time did Lt. Reyes review the police report with her, nor did he provide any information on how to file a police or civilian complaint against the HPD.  Lt. Reyes told her there was an investigation on its way.  Id. at ¶ 12-16

43. Ms. Hernandez-Pagan was not satisfied with Lt. Reyes's explanation because he never told her or FT they could file a complaint.  Id. at ¶ 17.

<u>Material Facts; Officer James Dunn</u>

44. **Exhibit # 7** is a fair and accurate copy of Officer Dunn's deposition transcript taken on 2/23/2018.   Dunn joined the HPD in 2004. Trans. at 10.

45. Dunn testified he was trained and understood that whatever force an officer uses has to be reasonable. Trans at 8.

46. Officer Dunn is 5' 11" and weighed anywhere between 250-260Lbs.  Trans. at 23.

47. On the evening in question, he responded to a report of shots fired after receiving a police radio dispatch. Id. at 27.  He then came in contact with FT.  Id. at 22, 37.

48. FT was found in the middle of an alleyway and he was crouching on the ground when Dunn first saw him. Id. at 37.

49. When Dunn saw him he yelled at FT to get on the ground. Id. at 46.   Dunn testified that when FT raised his hands up as ordered, he  was not holding any weapons in his hands. Id. at 51-53.

50. Dunn drew his gun and stood a few feet away from Officer Leahy. Id. at 43.  Leahy was also pointing a gun at FT while telling him to get down Id. at 44.

51. FT was in front of them at approximately 10 yards away, or, 30 feet.  Id.

52. Dunn then activated the flashlight/lamp of his gun and pointed it at FT. Id. at 4).  The activation of the light on his gun added illumination to the scene. Id. at 46.

53. Dunn pointed his gun at FT in the ready position, or, in a position that was ready to fire at him. Id. at 46.

54. Dunn claimed they screamed at FT to get down on the ground. Id. at 46, 47.

55. Dunn testified he did not know he was dealing with a child, or even a large person.  Dunn also testified he didn't see anything in FT's hands, that FT's hands were open and he also did not see any weapons in his hands. Id. at  51-52.

56. In addition to his gun tactical light and the headlights of Leahy's cruiser, there were some street lights on Water Street which also provided illumination to the scene. Id. at 52.   The visibility was therefore not bad. Id. at 52.

57. According to Dunn, Officer Jabet Lopez arrived after FT had been handcuffed. Id. at 52-53.

58. Dunn was unsure if he handcuffed FT, he could have, but he did not remember. Id. at 53.

59. Dunn testified he struck FT several times but was unsure how many times he did struck him.  He testified that it could have been as much as three to four times. Id at 54.   Dunn struck FT with a closed fist and he probably struck him in the head. Id. at 55.

60. Dunn testified struck FT as hard as he could. Id. at 56. He also tackled FT after he ran towards FT and hit him as hard as he could. Id. at 59-60.  FT, according to Dunn, did not lose consciousness.  Id. at 55.

61. Dunn suggested that FT's  injuries occurred as a result of fighting the police.  Id. at 62-63.  Dunn did not remember how many times Officer Lopez struck FT with the baton Id. at 64.

62. Dunn also claimed he walked FT to his cruiser after he was arrested. Id. at 64-65.

63. Dunn testified he did not notice any injuries sustained by FT.  However, at the station he appeared to have abrasions that appeared to look like road rash Id. at 69, 76.

64. **Dunn testified he prepared a contemporaneous police report but he did not prepare a use of force report. Id. at 70. Dunn was not sure if an officer had to prepare a use of force report for striking a citizen in the head. Id.**

65. Dunn had been previously disciplined for what he alleged was an accidental discharge of his firearm in a car with individuals where no one was injured. Id. at 70-71.  His discipline consisted of two days without pay, maybe three.  Id. at 72.

66. Dunn testified he was not interviewed by the Chief after that shooting. Id. at 72.

67. Dunn grieved the suspension which was upheld for a three days.  When questioned why he filed a grievance to the suspension after firing a gun into a car occupied by individuals he responded: "Why not?"  "That's the only time I have been disciplined." (74).

The testimony of Officer Thomas Leahy

68. **Exhibit # 8** is a fair and accurate copy of Officer Thomas Leahy's deposition transcript taken on 2/23/2018.   Leahy joined the HPD in 2011. Trans. at 5.

69. Leahy testified he is 6' 2" and weighs 250lbs.  Id. at 6.

70. Officer Leahy testified FT was approximately 5' tall.  Id. at 7.

71. When he attended the Springfield Police Academy he was trained on the use of force. Id.

72. Leahy testified that he was involved in the arrest of Edgar Zayas, Id. at 16,  and believes he placed his handcuffs on FT.  Id. at 11, 16.

6

73. Leahy also interviewed and interrogated Edgar Zayas after his arrest.  Zayas confirmed that FT tried to stop him from committing suicide. Id. at 34, 37.

74. Leahy did not include in his Application for Criminal Complaint what he learned from Zayas:  that FT was trying to save Zayas' life when he came in contact with him and that he had tried to dissuade him from killing himself. Id. at 39, 79.

75. After arresting Zayas, Leahy saw FT approximately 75 yds. away from him behind a concrete wall.  Id. at 44-45.

76. Leahy followed FT with his cruiser through some industrial buildings meeting him on the other side of a building on Mills Valley Road.  Id. at 47, 49.

77. Leahy then walked away from his cruiser and found FT some 10 yards away from him in a crouched position with his hands in front of him. Id. at 48.

78. Leahy drew his service pistol and then saw officer Dunn arrive to assist him. Id. at  48, 49.

79. When Leahy first observed FT, FT ran towards Leahy, or, towards his direction. Id. at 50.

80. Leahy realized that FT did not have a weapon in his hands and FT was facing him (51, 52).

81. Leahy did not instruct FT to get on his knees. Id. at 52.

82. Leahy saw Dunn run towards FT to go hands-on and then tackle him.  Id. at 52-53.

83. When FT ran in the direction of Leahy, Leahy instructed him to keep his hands up and to stop. Id. at 92.

84. Leahy observed Dunn running towards FT to tackle him.  As he ran towards FT, Dunn re-holstered his gun. Id. at 54, 58.

85. Dunn tackled FT frontally, according to Leahy.  Id. at 54.  When Dunn tackled FT, FT was squatting down.  Id. 55.

86. Leahy thought that when FT squatted down he was going to start running. Id. at 57.

87. After FT was tackled to the ground, he landed in a prone position and he was much smaller that Leahy. Id. at 58.

88. Leahy did not observe FT with any weapon. Id. at 59.

89. Leahy also observed Officer Lopez striking FT with his baton while he was laying in a prone position on the ground. Id. at 60.  Leahy testified he did not know who struck FT in the head. Id. at 60.

90. Leahy testified he did not see Officer Dunn striking FT in the head. Id. at 60-61.

91. Leahy testified he struck FT in the legs and on his side as he tried to handcuff him. Id. at 61.

92. Leahy testified he walked FT to a police cruiser after he handcuffed him and with Lopez's assistance. Id. at 76.

93. Leahy observed Lopez striking FT in the legs and on the side with a police baton which resulted in the preparation of a use of force report.  Id. at 61.

94. Leahy testified that not every police use of force requires an officer to prepare a use of force report which explains why he himself did not prepare a separate use of force report to document his interactions with FT or the blows he delivered to him.  Id. at 66.

95. Leahy agreed that Dunn did not prepare a use of force report either. Id. at 66.

96. Leahy returned back to the HPD police station when FT was being booked. Id. at 78.

97. **Ex. 3** is a fair and accurate color photographs representation of FT's condition at the HPD.

98. Leahy testified that officer Dunn struck FT at least once. Leahy agreed that he struck FT in the rib area by his arm with a closed fist once or twice. Id. at  89.


The testimony of Officer Jabet Lopez


99. **Ex. # 9** is a fair and accurate copy of Officer Jabet Lopez' ("Lopez") deposition transcript taken on 2/23/2018.   Lopez joined the HPD in 2014. Trans. at 5.   Lopez testified he is 5' 8" and weighs 185 lbs.  Id at 57, 83.

100. Lopez was trained and knew that police officers could only use that level of force that is reasonably necessary to bring an incident under control. Id. at 71.

101. Lopez testified that he arrived at the location of FT's arrest to provide assistance and when he arrived FT was already on the ground and in a prone position. Id. at 40-41.

102. When Lopez arrived, FT was on the ground, surrounded by officers.  He was not handcuffed and he was "squirming," according to Lopez. Id. at 49.

103. When Lopez assisted with the arrest of FT, he was wearing a Nonatuck expandable baton measuring approximately 14" and ½" in diameter. Id. at 50-53.

104. Lopez knew that there were prohibited striking zones of the body with a baton.  He testified "Head, I believe. That's all I can recall. It's a big chart." Id. at 53.  He understood prohibited striking zones as "A red zone, a kill zone. I would say." Id. at 54.

105. Lopez was unaware the spinal cord was a red zone.  Id at 55.

106. Lopez alleged he delivered 2 strikes to FT, but that it was possible he struck him more than two times.  Id. at 53-56.

107. Lopez struck FT with the baton in the kidney and rib area. Id. at 56.   Lopez admitted that he intentionally struck FT with his baton in those areas. Id.

108. Lopez was unsure how much force he used when he struck FT with his baton. Id.

109. Lopez struck FT with his baton when FT was prone on the ground. Id. at 62.

110. Lopez testified that when he filled out his use of force report he checked off that the suspects actions were "assaultive" and were warranted because of "serious bodily harm/death."  Id. at 62.

111. Lopez testified that he checked these boxes in the use of force report on the basis of the shots that were fired by Zayas at the bridge, i.e., "I was indicating when I wrote this,that based on his action or suspected actions on the bridge, he was assaultive, serious bodily harm/death."  Id.

112. Lopez was asked: Q: So, you're saying that this prone individual, [FT] on the ground with no weapon, face down on the ground, was engaging in assaultive, serious, bodily harm and potential death?  A: Yes. That's the report we got." Id. at 63.

113. In the use of force report Lopez filled out in the aftermath of his encounter with FT, Lopez did not state FT had suffered any harm.   He did not mention any scrapes or swelling although he admitted at his deposition he observed such harms. Id. at 66-67, 73.

114. Lopez testified he handcuffed FT. Id. at 78.

115. Lopez assisted walking FT to the police cruiser and observed he walked sluggishly. Id. at 80.

116. Lopez also accompanied FT in an ambulance to the hospital. Id  at 99.

117. Lopez told EMT's that there was an altercation on Water Street that involved FT. Id. at 87.

118. No one from internal affairs questioned Lopez about the matter and Chief Neiswanger did not talk to him about FT's arrest.  Id. at 55, 77.

119. Officer Lopez was questioned regarding another federal lawsuit against the City of Holyoke (Smith v. City of Holyoke, et al, USDCT CA No. 3:17-cv-30078), but he was instructed not to answer any questions about this involvement in that case. Id. at 94-96.

120. Lopez testified he has never been questioned by internal affairs regarding the Smith v. Holyoke case. Id. at 93.

121. **Ex. 10** is a fair and accurate copy of an affidavit prepared by Edgar Zayas on February 4, 2017.

122. Mr. Zayas stated: FT asked him what he was doing and followed him.  He saw FT injured at the police station with facial bruising.  FT did not have a gun.  Zayas asked Detectives at the HPD what FT was doing at the station and that he had nothing to do with what happened that evening, but, "The police ignored my questions and kept pushing me towards the Detective room."

Material facts Chief Neiswanger Monell Claim

123. **Ex. 11**, is a fair and accurate copy of Chief Neiswanger's deposition.

124. James Neiswanger ("Neiswanger") was Chief of Police in Holyoke for approximately 6.5 years 4.  Before that he had been Chief of Police in Manchester, Connecticut, a police force with 120 sworn officers Depo Trans at 5.  Chief Neiswanger was the internal affairs investigator for the Manchester Police Id.  at 7.

125. Neiswanger testified the HPD has 118 sworn officers. Id. at 14.

126. The HPD has an internal affairs unit/Bureau Professional Standards (BOPS) consists of one assigned Lieutenant Id. at 9.   Unlike the Manchester police department the BOPS in Holyoke is not computerized. Id. at 9, 11.

127. According to Neiswanger, if a citizen complains about a police officer (for instance a complaint of discourtesy) they will speak to the shift CO and he/she will handle the complaint at that level "and it ends there." Id. 10,15.  However, if there is more to the complaint or the complainant is not satisfied,  the complainant can pursue a written complaint which triggers involvement by Field Operations, generally a captain. Id. at 10.

128. If a citizen wants to file a civilian complaint, he cannot download a complaint form electronically.  An individual has to come to the police station. Id. at 15.

129. According to Neiswanger, Lieutenant Many Raez ("Reyes") runs internal affairs but he does not know what type of courses he has attended. Id. at 11-12.

130. If a citizen prepares a written complaint, a Captain reviews it and sends it up the chain of command. It thus goes from a Captain to the Chief's office. Id. at 16.

131. According to Chief Neiswanger, the HPD appears to have a two-track system of complaints: (a) one that is informal, and, (b) one that deals with more serious complaints which he calls Disciplinary Action Notice or "DAN." Id. at 17:2-24.

132. Neiswanger testified IAD does an average of six investigations a year. Id. at 17.

133. The Holyoke Mayor is the firing and hiring authority and he makes recommendations to the Mayor as appropriate. Id. at 18, 20.

134. Neiswanger was not sure how many officers he has disciplined but he has not disciplined anyone for the use of excessive force. Id. at 19.

135. Neiswanger testified that officer James Dunn was disciplined for an accidental discharge of a firearm into a motor vehicle occupied by individuals. Id. at 20-21.

136. **Ex. 12** is a fair and accurate copy of HPD Inter office Memorandum from Internal Affairs regarding a May 15, 2014 police shooting involving Officer Dunn.

137. Dunn's IAD complaint was sustained on grounds that "Officers shall not use or handle weapons in a careless or imprudent manner…"

138. Neiswanger explained that when police receive a complaint of excessive force, the individual must come in to the station and speak with the shift supervisor where he/she is given a complaint to fill out if they want to. Id. at 22. According to the Chief, "If it looks like there is an excessive use of force, we would investigate it." Neiswanger determines if there is a claim by looking at the reports that come before him. Id. at 23.

139. Chief Neiswanger was asked how police track injured prisoners. He was also asked whether he was familiar with the injured prisoner statue. Id. at 23. He replied he was not aware of the injured prisoner statue and would have to review the policy as to how police track injured civilians. Id.

140. Document 42, or Defendants' **Ex. 11,** discusses the Massachusetts Injured Prisoner Statute at page 9 of 22 in the context of the preparation of use of force reports. (Policy 8.2.0 and 8.2.1 effective 7/15/2012, Standard Operating Procedures).

141. This policy states that following a use of force by an officer, he/she will file a report with his/her commanding officer discussing the circumstances that required the force. The policy requires, "The report filed by an officer involving the use of force shall be in addition to any arrest report etc. <u>and directed to the Office of the Chief</u> via the

Commanding Officer prior to the expiration of his/her tour of duty when the officer in (sic) incapacitated (i.e. being treated in the hospital) (Emphasis supplied).

142. This policy also provides in Paragraph 5, that "In accordance with MGLA Chapter 276 Section 33, the Commanding Officer shall forthwith, file a written report and submit to the office of the Chief of Police."

143. There can be no doubt from the Chief's testimony that he was unaware of the Mass. Injured Prisoner Statute and from Defendants' documents that the HPD was not following MGL 276 § 33. See note at infra.

144. The Massachusetts injured prisoner statute provides at G.L.c. 276, § 33 that "Examination of arrested persons for injuries; reports; penalty.  Section 33. Whenever a person is arrested for a crime and is taken to or confined in a jail, police station or lockup, the officer in charge thereof shall immediately examine the prisoner, and if he finds any bruises, cuts or other injuries shall forthwith make a written report thereof to the chief of police of the town concerned, or in Boston to the police commissioner, and in towns where there is no chief of police to the selectmen if the place of confinement is under control of the metropolitan district commission, the report shall be made to it. The requirement that the prisoner be examined shall not be deemed to compel the removal of clothing. When a person is transferred from one place of confinement to another prior to his arraignment in court or to his release, the requirement that he shall be examined shall apply only to the place to which he is first taken after his arrest. Whoever violates this section shall be punished by a fine of not more than ten dollars."

145. Neiswanger testified he understood the policy for injured individuals to mean, if someone was injured, "we get them medical help." Id. at 23.

146. Neiswanger testified he was unsure what kind of questions, if any, an injured prisoner would be asked during the booking process about their injuries because he has never booked anyone in Holyoke. Id. at 24, 25, 26.

147. Chief Neiswanger testified when told about the Mass. Injured Prisoner statute that "When you are talking about the statute about the injured Prisoner Statute, this is enlightening to me." (25).

148. **Ex. 13** is a true and accurate copy of Hector E. Pineiro's Affidavit.

149. **Ex. 14**, is a fair and accurate copy of injured prisoner reports from 8/19/2017 through 5/5/16 that were provided in discovery by the City of Holyoke.  **Ex. 14** is 29 pages long and has some police reports that correspond with the injured prisoner report as well as some use of force reports.[1]

---

[1] Injured Prisoner reports are organized chronologically.

150. The injured prisoner reports identify (a) the name of the person injured, and, (b) the arresting officer. The form also provides a description and nature of the injury, and, the extent and location of injury.   It  also states at the bottom of the form that "The original and all attachments are to be submitted to the Chief of Police Within 24 hours of injury occurrence."

151. None of these forms were delivered, reviewed or signed by Neiswanger. <u>See</u>, e.g.,  Ex. 13, at page 2.

152. The City has not provided an injured prisoner for FT during discovery.

153. The HPD conducts about 2,500 arrests per year. Id. at 26.  Neiswanger testified he does not read every report and when he does, he reads "very few" unless they are brought to his attention. Id. at 26.

154. Neiswanger testified he does not receive or review injured prisoner reports, but, it "Doesn't' mean it doesn't exist. I just don't recall seeing it." Id. at 27.

155. Neiswanger does not report the number of civilian complaints to the Mayor of Holyoke Id. at 27.

156. Neiswanger testified HPD  has terminated officers while other officers have resigned (28).  One officer was terminated for domestic violence against his wife (a deadly weapon).  Id. at 29-30.  Another officer was involved with drugs and resigned. Id. at 31.

157. Neiswanger testified that state or federal complaints against the City police department that allege violation of civil rights <u>are not automatically investigated</u> because "People make complaints against the Police Department that aren't always accurate or factual" and because a lawsuit does  not mean what they are alleging happened." Id. at 33.

158. When asked if there was a practice of not investigating federal civil rights cases, Neiswanger testified it is done on a case by case basis. Id. at 34.


<u>What Neiswanger knew about the arrest of FH/Failure to investigate/discipline</u>

159. Neiswanger did not request that the state/federal complaint filed by Hernandez Pagan be investigated by internal affairs because "we had already looked at the matter" and that he determined it was legitimate use of force based on the facts he understood them.  Id. at 35.

160. Neiswanger testified he felt HPD officers did an overall good job. Id. at 36.

161.  In the within investigation, Neiswanger received a phone call, was told what happened and was told someone had fired a weapon. Id. at 36-37.

162. Neiswanger was not told by police that FT was a 12 year old, but he did know a child was arrested. Id. 37, 38.

163. No one told Neiswanger that FT did not have a gun.  Id. 38.   Neiswanger was unaware that FT was trying to convince the shooter, Zayas, not to kill himself.  Id. at 38, 39, 40.

164. He was also unaware that another person was arrested in addition to Zayas, and,  FT was with Jose Rivera, who told police the only gunman was the one on the Veterans' Bridge. (Edgar Zayas) (40).

165. Neiswanger testified he had only disciplined Officer Dunn for five days after the officer shot inside of a car occupied by individuals and that he was satisfied with that punishment describing it as an 'accidental event' arising from the use of an aftermarket attachment to his weapon, or, a light on the weapon.  Id. at 41.

166. Neiswanger understood that FT was tackled by officer Dunn, that Dunn struck FT a couple of times as they tried to handcuff him and that Lopez used his baton as they told him to stop resisting while handcuffed.  Id. at 44.

Documentation on the use of force:

167. According to Neiswanger, when HPD officers point weapons at suspects in Holyoke a "Use of Force Report" is filled out. Id. 45.  Neiswanger testified he was unsure if police officers prepared a separate use of force report to document these events from their usual incident reports.  Id. at 46.

168. For instance, Neiswanger claimed/testified that every time an officer pointed a gun at a civilian he could review the reports, "Yeah, you can. " He further testified that because of the type of city Holyoke is, his officers do point weapons at people.  Id.  at 46.

169. Neiswanger testified the HPD tracks the use of force with use of force reports in situations in which police deploy things like canines, tasers,  batons or OC spray.  Id. at 47, 48-50.

170. Neiswanger testified use of force reports are reviewed by internal affairs and that they sit in a file.  At the end of the year internal affairs reviews them. Id.

171. Neiswanger testified he does not review use of force reports.  Id. at 50-51.

172. However, HPD policy 8.2.0 and 8.2.1 required him to do completely the opposite.  Cf., "The report filed by an officer involving the use of force shall be in addition to any arrest report, etc. and directed to the office of the Chief via the Commanding Officer prior to the expiration of his/her tour of duty…."  See Defendants' Doc. 42 (Ex. 11 at page 9 of 22).

173. **Ex. 12** is a true and accurate copy of Hector E. Pineiro's Affidavit.

174. **Ex. 15, Ex. 16, and 17** are Use of Force reports provided by Holyoke during discovery from 7/2/2016 through 9/7/2012.  These records appear in chronological order and are paginated for the court's convenience.[2] (Affidavit of Hector E. Pineiro)

175. The use of force reports in Ex.'s 15-17 mention: the reporting officer, the suspects name, the type of implement used by police, i.e., Holds, locks, OC spray, X 26 Taser Drive Stun, Strikes, Batons, Firearm, etc.  These records also have "Supervisors' Review Use Comments for the immediate supervisor of the officer involved and a Signature from an additional reviewing supervisor, typically a Captain.[3]

176. At the very bottom of the Signature section of the form for the Bureau's Commander, it reads that ***"This form is to be submitted to the Chief's Office immediately upon Completion."***

177. None of the use of force reports were read, signed or acknowledged by Neiswanger.

178. Only one use of force report documented the use of hand "strikes."  See Ex. 14, at page 21 Use of Force Report of Jose DeJesus "Strikes Knee hands."

179. Neiswanger testified if police officers punch or strike civilians with their hands "that would show up on a Use of Force Report."[4]

180. Not a single Holyoke use of force report from 2012 through 2016 documents police displaying, or pointing, a firearm at a suspect although these records document police brandishing or displaying TASERS to gain compliance from arrestees.  See, e.g. Ex. 15, at page 7 ("Taser was only shown, not activated, which caused compliance and was re-holstered"), page 12 ("Warning of use"), page 13 ("X26P Taser Display Taser and Warning").

181. Neiswanger testified he does not provide a report(s) to the Mayor of Holyoke at the end of the year regarding HPD use of force reports because the mayor has not asked for them Id. at 51.

182. Neiswanger testified that if an officer hits a child in the head three or four times they are responsible to report that use of force in two separate reports, the incident report and a use of force report. Id. 52.

183. Defendants' **Ex. 8 (Document 41** the Jabet Lopez use of force report) only documents the baton strikes to FT.  No use of force report was submitted either by Leahy or by Dunn to document the blows delivered by Leahy, Dunn's tackle or the blows delivered by Dunn to FT's head or the fact that officers pointed their loaded guns at him.

---

[2] Exhibit 13 contains the most recent injured prisoner report provided by the City of Holyoke during discovery.
[3] These exhibits (13-15) contain a total of 139 pages of documents.
[4] Records of Use of Force Reports provided by the City during discovery demonstrate this is not the case.

Neiswanger labyrinthine understanding of the facts surrounding FT's arrest

184. Chief Neiswanger testified he did not believe that Officer Leahy struck FT with a closed fist. Id. 51-52.  When informed that Officer Leahy had so testified Neiswanger said: "I guess it would surprise me" because "I didn't see that in any reports."  Id. at 53.

185. Chief Neiswanger has testified that from reading the police report prepared by officer Leahy he cannot determine what level of force police used on FT.  Id. 54.

186. Neiswanger testified that after reading Officer Leahy's report, he learned that Officer Leahy pointed his gun at FT but confirmed that Leahy did not prepare a separate use of force report documenting he pointed his gun at FT.  Id. at 55.

187. Neiswanger testified that an officer could only strike a person in the head with a police baton in a lethal force encounter.  Id. at 56.   Neiswanger testified he was not shown photographs that suggested FT was hit in the top of the head with a police baton. Id. at 57, 62.

188. Neiswanger testified that for a HPD officer to punch somebody in the head they would have to be engaged in an assaultive and combative behavior. Id.at 62.

189. Neiswanger was questioned on whether he was aware that Officer Dunn admitted striking FT with closed fists on the head while using as much force as he could and whether those facts, if true, raised any concerns.  He responded Officer Dunn was doing the best he could with the situation because, he argued, Dunn didn't know FT was 12 years old, "he was in a hoodie" and FT ran.  Id. at 59.

190. Neiswanger testified that photos of FT injuries appeared to show two cylindrical type of marks below his rib cage.  Id. at 60, 61.

191. Neiswanger testified that as far he knew Lopez did not strike FT in the head.  Id. at 64.

192. Neiswanger was questioned on a number of lawsuits filed against the City.  Such lawsuits were including the lawsuit brought in federal court by Michelle Cruz against Detective Barkyoumb, and, other cases that he was "unaware" of including Virgen Guzman which was not investigated by the City of Holyoke.  Id. at 65-69.

193. Neiswanger also testified that when the City receives a letter from a lawyer that provides the City with notice of violation of civil rights, "That doesn't automatically trigger an investigation." Id.at  69-70.

194. According to Neiswanger, in the Maria Hernandez v. City of Holyoke and Officer Josue Colon, et al, lawsuit, no investigation was undertaken by the City because, "I am not sure what you're getting at. Why would be investigate something that we're being sued on? I think we conducted, you know, whatever the case—the matter was the officers took a report and then when she was arrested and went through the court process, and now, we're getting – you know what, I don't see where your point is, like following up on that with an investigation." Id. at  69.

195. **Ex. 18**, is a fair and accurate copy of an affidavit prepared by Michelle Cruz in the federal civil rights case entitled Michelle Cruz v. City of Holyoke et al, Case No. 3:12-cv-30159-MAP, Doc. 72-1.

196. **Ex. 19**, is a fair and accurate copy of ruling made by United States Magistrate Judge Kenneth P. Neiman on November 21, 2014,  in connection with a summary judgment motion filed by the City of Holyoke in Cruz v. Holyoke, et al, Document No. 79.

197. Plaintiffs' incorporate the factual background outlined by the U.S. Magistrate Judge in that ruling.

198. In Cruz v. Holyoke, et al, the Magistrate Judge granted summary judgment to Holyoke on the *Monell* claim where the court, assumed, without deciding "that there exists some measure of a constitutional right underlying Plaintiff's claim in Count I.  The Court, however, ruled Plaintiff had proffered insufficient evidence to suggest or prove the existence of a custom, pattern or practice of inadequately and improperly investigating complaints of stalking stalking and harassment."

199. The Court denied summary judgment as to the claim against officer Barkyoumb and a supervisory claim (Count IV) against a supervisor of Officer Barkyoumb.

200. The City of Holyoke paid Ms. Cruz $30,000 to settle her lawsuit.

https://www.wwlp.com/news/i-team/holyoke-settlements-and-judgments/1043549603

201. Ex. 20 is a fair and accurate copy of a Ruling by U.S. Magistrate Judge Robertson, in Hernandez v. Josue Colon, et al, USDCT-MA Memorandum of Decision and Order Regarding Defendants' Motion for Summary Judgment (Dkt. No. 47), CANo. 3:16-cv-30089-KAR.

202. Plaintiffs' incorporates the factual background outlined by the U.S. Magistrate Judge in her ruling at pages 2-7.  Plaintiff also incorporates the rulings as to Counts I, II, III, IV, V, VI, VII, VIII, IX and X.

203. In Hernandez, the Magistrate Judge granted summary judgment on the *Monell* claim because Plaintiff did not establish a "direct link" between the City's custom when participating in utility shut-offs and the deprivation of a constitutional right." (Memorandum at 37).

204. **Ex. 21**, is a fair and accurate copy of the juvenile record of FT.  FT was charged with disorderly conduct and resisting arrest.

205. On 7/16/2015, a nolle prosequi was filed for FT's case in the Juvenile Department.

206. **Ex. 22**, is a fair and accurate copy of Plaintiff's Fed. R. Civ. P. Rule 26 expert witness report rendered by Dr. Chirkov, a forensic pathologist.

207. Dr. Chirkov concluded that FT suffered a number of injuries including injuries that occurred as a result of being tackled to the ground and after being subjected to blunt force impact while on the ground to the head, back and right torso.

208. Dr. Chirkov opined FT was hit from behind with closed fists and a police baton.  To a reasonable degree of medical certainty his injuries could not have completely occurred as described by the police officers.  His facial injuries mostly consist of injuries from secondary impact to the ground when he was face down in the area were they arrested him, on a paved road surface.

209. The injuries on the left side of his face occurred from the contact and deceleration between his face and the road.  The injury and laceration on the top right of the head certainly involved blunt trauma from a fist or from the tip of the police baton.

210. Chirkov will opine, Officer Lopez must have struck FT with the baton, not once as he alleges,  but twice because of the imprint of the police baton on his rib area. The bruising created by these blows are approximately 2" apart. When FT was struck in this area by officer Lopez, his hands could not have been tucked or hidden underneath his stomach belly because they would have resulted instead in injuries to his upper arm.   For this injury to have occurred, FT had to be fully prone on the ground with at least his right hand being extended upwards.   Furthermore, and to a reasonable degree of medical certainty, it is highly unlikely that FT hands were tucked in his waist area. Had this been the case, as alleged by the arresting officers and with any resistance on the part FT, Dr. Chirkov would have also anticipated to see abrasions to either the exterior or interior portion of this hands because he was arrested in an irregular paved road. Instead, the injuries to his wrist appear to have been caused by handcuffs.  It is also Dr. Chirkov's opinion that when office Lopez struck FT with the police baton on the right flank there could not have been a police officer positioned on the right side of FT torso.   Dr. Chirkov's opinion for that bruising to have occurred, officer Lopez must have employed a significant amount of force.

211. Exhibit **Ex. 23**, is a fair and accurate copy of Plaintiff's Fed. R. Civ. P. Rule 26 expert witness report, Dr. Alvarez, a Children's Hospital Pediatric Neurologist.

212. Dr. Alvarez summarized FT's past and present medical/psychological pertinent history [Report at 3-5].

213. After reviewing medical records, and other documentation, and after an examination of FT, he concluded to a reasonable degree of medical certainty that FT suffered a brain concussion – which is not dependent on whether he lost consciousness or not (Report at 6/7), suffered facial injuries to his cheek, ear, a hematoma to the anterior left scalp, as well as multiple abrasions (R. at 7), suffered from post-concussion syndrome with behavioral sequelae suffered which is causally related to the brain concussion, FT was in need of psychiatric services in 2017.

Respectfully submitted,
JANETTE HERNANDEZ PAGAN, PPA FT
Plaintiff, by his attorneys

*/s/ Hector E. Pineiro*
Hector E Pineiro BBO# 555315
Robert A. Scott BBO # 648740
Law Office of Hector Pineiro, P.C.
807 Main Street
Worcester, MA 01610
(508) 770-0600
hector@pineirolegal.com

DATED: August 9, 2018

**CERTIFICATE OF SERVICE**

I, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants as listed below:

*/s/ Hector E. Pineiro*
Hector E. Pineiro