UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARIA HERNANDEZ, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 3:16-cv-30089-KAR |
| | ) |
| JOSUE COLON, ROGER GOUDREAU, | ) |
| EMIL MORALES, & CITY OF HOLYOKE, | ) |
| | ) |
| Defendants | ) |

MEMORANDUM OF DECISION AND ORDER REGARDING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
(Dkt. No. 47)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

This suit asserts claims under the civil rights statute, 42 U.S.C. § 1983, and

Massachusetts common law against three Holyoke police officers in their individual capacities

and the City of Holyoke ("City").  Plaintiff Maria Hernandez's ("Plaintiff") allegations arose

from the events surrounding a utility shut-off at her residence.  The first amended complaint

presents federal claims against Officer Josue Colon ("Colon") and Officer Roger Goudreau

("Goudreau") for unreasonable seizure (Count I), unlawful arrest (Count II), the excessive use of

force (Count III), and the failure to intervene (Count IV).  Plaintiff alleges that Officer Emil

Morales ("Morales") unlawfully entered her residence (Count X).  Plaintiff further alleges that

the City failed to discipline and train its police officers to conduct utility shut-offs (Count V).

Plaintiff's pendant state law claims against Colon and Goudreau allege assault and battery (Count

VI), false arrest and imprisonment (Count VII), malicious prosecution (Count VIII), and abuse of

process (Count IX).

Defendants have moved for summary judgment on all counts of the complaint (Dkt. No. 47).  To the extent some counts survive their motion, Defendants have also requested bifurcation of the sole claim against the City, Count V, from the counts against the individual officers. Plaintiff has opposed Defendants' motion for summary judgment, and Defendants have replied to Plaintiff's opposition (Dkt. Nos. 58, 62).  After the court heard the parties' arguments on January 24, 2018, they submitted supplemental briefs addressing the Supreme Court's recent decision in *Dist. of Columbia v. Wesby*, 138 S. Ct. 577 (2018) (Dkt. Nos. 66, 68).  The parties have consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  For the reasons detailed below, the Defendants' motion for summary judgment is DENIED as to Counts I, II, III, IV, VI, VII, VIII, IX, and X and ALLOWED as to Count V.  The Defendants' motion to bifurcate is moot in view of the court's ruling regarding Count V, Plaintiff's *Monell* claim.

## II.    FACTUAL BACKGROUND[1]

---

[1] Unless another source is cited, the facts are drawn from the following materials:  (1) Defendants' Statement of Material Facts in Support of Motion for Summary Judgment and the exhibits attached thereto (Dkt. Nos. 48, 49); (2) Plaintiff's Response to Defendants' Statement of Material Facts in Support of Motion for Summary Judgment and the exhibits attached thereto (Dkt. No. 59); (3) Plaintiff's Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment and the exhibits attached thereto (Dkt. No. 60); and (4) audio files of Holyoke Police Department telephone calls and radio communications, which both parties submitted.  Defendants present a different version of the events underlying the claims in this case and their arguments are, to a large extent, based on their version of events.  In accordance with the summary judgment standard, the evidence is viewed in the light most favorable to Plaintiff, the nonmoving party, and all reasonable inferences are drawn in her favor.  *See Tolan v. Cotton,* 134 S. Ct. 1861, 1863 (2014) (per curiam); *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993).

Defendants' Reply to Plaintiff's Opposition to Motion for Summary Judgment (Dkt. No. 62) alleges that facts contained in paragraphs 4-11, 16, 18, 22, 23, and 84-90 of Plaintiff's Statement of Material Facts are immaterial and irrelevant and requests that they be stricken. Defendants' request is denied because, in the court's view, the facts contained in these paragraphs are relevant as background information or are cumulative of information contained in the audio files.  To the extent the court deems any of the proposed facts irrelevant or immaterial, they will not be considered.  *See Stagikas v. Saxon Mortg. Servs., Inc.*, Civil Action No. 10-40164-TSH, 2013 WL 10093484, at *1 (D. Mass. Sept. 24, 2013).

On May 27, 2014, Plaintiff owned the townhouse at 87 Newton Street in Holyoke and resided there with her three children and a dog (Dkt. No. 59-3 at 7, 8, 39). The home was approximately in the middle of the block of "connected" townhouses that stretched between Cabot and Essex Streets (Dkt. No. 59-7 at 8). An alley behind the townhouses ran between these streets (*id.*).[2]

Plaintiff's payments to Holyoke Gas and Electric ("HG&E") were past due on May 27, 2014 (Dkt. No. 59-3 at 27; Dkt. No. 60-3 at 1-13). In all five months from January to May 2014, she had received notices that her electricity and gas services were "subject to discontinuance" (Dkt. Nos. 60-3 at 1-13, 60-4). A May 21, 2014 letter from HG&E informed Plaintiff that the gas and electric services would be terminated on May 27, 2014, that a HG&E employee would enter the building, and that a police officer would be present (Dkt. No. 60-5).

At 1:20 P.M. on May 27, 2014, Robert McNulty ("McNulty"), a junior meter technician with HG&E, telephoned the Holyoke Police Department requesting an officer to "stand by" at 87 Newton Street with him and a locksmith while he terminated the utility services (Dkt. No. 60-6 at 5; Dkt. No. 63, Ex. 1 at 13.20.58).[3] McNulty and the locksmith were at the front door when Morales responded to 87 Newton Street at 1:57 P.M. (Dkt. No. 59-4 at 10; Dkt. No. 63, Ex. 1 at 13.57.57). McNulty and Morales knocked, but no one responded (Dkt. Nos. 59-4 at 11; 60-6 at

---

[2] Geographical facts are suitable for judicial notice. *See Mitchell v. Nolla, Galib & Compania*, 176 F. Supp. 883, 886 (D.P.R. 1959).

[3] Both parties have submitted audio files containing the Holyoke Police Department's recordings of telephone calls and police radio communications from May 27, 2014 that are related to the instant case. The audio recordings will be cited as "Dkt. No. 63, Ex. 1 at [the military time displayed on the audio file]." The times of the communications are shown in 24-hour, military time designations and span the period from 13:30:58 (1:20:58 P.M.) to 14:46:44 (2:46:44 P.M.). For ease of reference, the court will convert military time to the corresponding non-military time in Holyoke on May 27, 2014.

14-15). The locksmith's attempts to open the door were unsuccessful (Dkt. No. 60-6 at 14). At 2:15 P.M., Morales contacted the police department's dispatcher and requested a history and a telephone number for 87 Newton Street (Dkt. No. 63, Ex. 1 at 14.15.25). The dispatcher responded about two minutes later and reported that calls for 87 Newton Street in the "past couple years" were "mostly medicals" and "attempts to serve paperwork" (Dkt. No. 63, Ex. 1 at 14.17.05). Morales reported that he heard a dog inside and someone stomping on the ground (*id.*). Morales informed the dispatcher, "Somebody's inside, they just refuse to open" (*id.*). Morales was familiar with the floor plans of the townhouses on Newton Street (Dkt. No. 48-7 ¶ 5). It sounded to him as if someone came down the stairs and moved away from the front door (*id.* ¶ 7).

    A.    <u>The Stop of Plaintiff</u>

At 2:18 P.M., Morales requested that an officer respond to the rear of 87 Newton Street to see if anyone was in the alley (Dkt. No. 63, Ex. 1 at 14.18.25). Colon, who was on patrol, arrived in the alley behind the townhouses on Newton Street about one minute after Morales' call (Dkt. No. 59-7 at 5-6, 8; Dkt. No. 63, Ex. 1 at 14.19.33).[4]

Plaintiff was not at her residence at approximately 2:00 P.M. (Dkt. No. 59-3 at 29). Her mother was there and her friends were on the second floor with their three children (*id.* at 32, 33). When Plaintiff returned from running errands, her mother reported that HG&E personnel were across the street (*id.* at 35, 36, 38, 39). Plaintiff then went to her first floor bedroom, got a receipt for the bail that she had posted for her friend, and left her home through the back door intending to collect the bail money and use it to pay her utility bill (*id.* at 38-39, 43).

---

[4] Morales monitored Colon's activity over the radio (Dkt. No. 59-4 at 14).

Plaintiff saw Colon before she reached the gate that separated her backyard from the alley (*id.* at 44). Plaintiff did not dispute the officer's observation that she left a townhouse (Dkt. No. 59-3 at 45-46; Dkt. No. 59-8 at 3). Colon did not know for certain that Plaintiff was leaving from 87 Newton Street as opposed to one of the other townhouses (Dkt. No. 59-7 at 11). When Colon asked Plaintiff her name, she responded, "Milagro," her middle name by which she was known (Dkt. No. 59-3 at 48; Dkt. No. 59-8 at 3). Colon accused her of trespassing (Dkt. No. 59-8 at 3).

Plaintiff then unlocked the gate, entered the alley, closed the gate behind her, locked it, and waited (Dkt. No. 59-3 at 46, 48; Dkt. No. 59-8 at 3). When Colon did not speak to her, she walked away (Dkt. No. 59-3 at 46, 48). At 2:20 P.M., Colon reported over the radio that a female just came out and told him that she did not live there (Dkt. No. 63, Ex. 1 at 14.20.41). Morales directed Colon to "hold onto her" (*id.*).

Plaintiff paused when Colon approached her (Dkt. No. 59-3 at 48-49). Colon did not say anything, but reached toward her (Dkt. No. 59-3 at 49, 50; Dkt. No. 59-8 at 3). Plaintiff, believing that Colon was going to touch her, yelled, "Don't touch me" (Dkt. No. 59-3 at 49; Dkt. No. 59-8 at 3). About three minutes after Morales directed Colon to detain Plaintiff, Morales radioed Goudreau ("Rog[er]") and instructed him to ask Plaintiff "who else was inside" (Dkt. No. 63, Ex. 1 at 14.23.47). Morales "believe[d] there[] [was] somebody else inside [who] locked it when she walked out" (*id.*).

B.     The Arrest of Plaintiff

Goudreau responded to the alleyway behind the townhouses on Newton Street at about 2:26 P.M. coming from the direction opposite from Colon (Dkt. No. 59-3 at 55; Dkt. No. 60-16;

Dkt. No. 63, Ex. 1 at 14.26.33).  Consequently, Plaintiff was between the two cruisers (Dkt. No. 59-3 at 55).

Goudreau exited his cruiser and approached Plaintiff telling Colon, "I'll take care of it.  I got it" (*id.* at 56).  Goudreau and Colon were approximately the same size:  5' 7" tall and about 198 pounds (Dkt. No. 59-11 at 1; Dkt. No. 60-18 at 1).  Plaintiff was 4' 11" and weighed approximately 100 pounds (Dkt. No. 60-17 at 16).  Goudreau pushed Plaintiff's chest with both hands as he informed her that he intended to tase her (Dkt. No. 59-3 at 56-58).  Goudreau then used one of his legs to sweep Plaintiff's legs out from under her (*id.* at 59).  She fell to the ground, face down, and "momentarily" lost consciousness (Dkt. No. 59-3 at 59; Dkt. No. 60-17 at 29).  Goudreau, who was on top of Plaintiff when she regained consciousness, withdrew his Taser from its holster, removed the cartridge, and applied the drive stun mode to the back of her right arm (Dkt. No. 48-9 ¶ 12; Dkt. No. 59-3 at 64; Dkt. No. 60-17 at 26, 29).[5]  Plaintiff's screams of pain attracted the neighbors' attention (Dkt. No. 59-3 at 65-66; Dkt. No. 60-17 at 29).

Plaintiff remained face-down on the ground (Dkt. No. 60-17 at 29).  She denied struggling with the officers and refusing their commands to remove her left arm from underneath her body (Dkt. No. 59-3 at 64-65, 74, 75; Dkt. No. 60-17 at 30).  Instead, she alleged that she was lying still when Goudreau applied his Taser's drive stun mode again, this time to her lower back on the right side (Dkt. No. 59-3 at 64, 65; Dkt. No. 60-17 at 31).  Plaintiff then stood with Goudreau's assistance and permitted him to handcuff her (Dkt. No. 48-9 ¶ 18; Dkt. No. 59-3 at 66, 67).  One of her wrists slipped out of a handcuff that was too loose (Dkt. No. 59-3 at 69, 70, 71-72).  Goudreau reapplied the handcuff and transported her to the police department at

---

[5] According to Plaintiff's expert, the primary function of the drive stun mode is to gain compliance through the "administration of pain" (Dkt. No. 60-14 at 14-15).

approximately 2:27 P.M. (Dkt. No. 59-3 at 71-72; Dkt. No. 63, Ex. 1 at 14.27.28).  During the

transport, Plaintiff told Goudreau that she was going to contact an attorney (Dkt. No. 59-3 at 72).

Neither Goudreau nor Colon sustained injuries during their encounter with Plaintiff and they did

not charge her with committing an assault and battery on a police officer (Dkt. No. 60-17 at 20,

24).

      C.      Plaintiff at the Police Department

At the police department, Plaintiff refused to provide her identifying information to the

booking officer and swore at an officer (Dkt. No. 48-5 at 6; Dkt. No. 59-3 at 73-74; Dkt. No. 63,

Ex. 1 at 14.43.47).  She was charged with disorderly conduct and resisting arrest (Dkt. No. 48-5

at 6).[6]  Although Plaintiff had a bruise on her arm, she did not complain to the police about any

injuries or request medical treatment (Dkt. No. 48-5 at 6; Dkt. No. 59-3 at 76).  Plaintiff claims

that since she was tased, she has been unable to lift heavy items, she stutters, and she experiences

tremors when she gets "nervous" (Dkt. No. 59-3 at 19-23).

      D.      Entry into 87 Newton Street

Morales, McNulty of HG&E, and Plaintiff's mother were present at 87 Newton Street

after Plaintiff was transported to the police department (Dkt. No. 60-6 at 22; Dkt. No. 63 Ex.1 at

14.28.04).  Plaintiff's mother told Morales that that Plaintiff lived at the townhouse and had the

keys to prove it (Dkt. No. 63, Ex. 1 at 14.28.04).  Morales relayed the following over the radio:

"Mom's here and mom says she [Plaintiff] has the keys on her so as soon as you can get the keys

over here, we can get in here" (*id.*).  After Plaintiff's keys were obtained from the booking area,

Colon delivered them to 87 Newton Street and Morales and McNulty "gained entry by using"

them (Dkt. No. 48-5 at 6; Dkt. No. 59-6; Dkt. No. 59-11 at 6; Dkt. No. 63, Ex. 1 at 14.30.27 &

---

[6] The charges were later dismissed (Dkt. No. 26 ¶ 41).

14.43.47). Police officers encountered two adults and three children who were hiding upstairs (Dkt. No. 48-5 at 6). McNulty terminated Plaintiff's gas and electricity service and officers left 87 Newton Street at approximately 2:45 P.M. (Dkt. No. 59-11 at 6; Dkt. No. 60-6 at 22; Dkt. No. 63, Ex. 1 at 14.45.11).

III.   ANALYSIS

A.   Summary Judgment Standard

"Summary judgment is appropriate when there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Washington v. Amand*, Civil Action No. 11-10771-PBS, 2018 WL 1718629, at *2 (D. Mass. Apr. 9, 2018) (quoting Fed. R. Civ. P. 56(a)). "To succeed on a motion for summary judgment, the moving party must demonstrate that there is an 'absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Sands v. Ridefilm Corp.*, 212 F.3d 657, 661 (1st Cir. 2000)). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "The burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue of material fact for trial." *Washington,* 2018 WL 1718629, at *2 (citing *Quinones v. Buick*, 436 F.3d 284, 289 (1st Cir. 2006)). A genuine dispute exists where the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995). A material fact is "one that has the potential of affecting the outcome of the case." *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986)). "In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party." *Cabot v. Lewis*, 241 F. Supp. 3d 239, 247–48 (D. Mass. 2017).

B.   Federal and State Claims against Colon and Goudreau

Plaintiff's federal and state claims against Colon and Goudreau arise from: (1) the initial stop; (2) the arrest; (3) the use of excessive force during the arrest; and (4) the failure to intervene.

      1.     Legal Standards

      a.     Section 1983

Plaintiff's federal claims are brought under the civil rights statute, 42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979)). "To state a claim under Section 1983, a plaintiff must show [1] that the challenged conduct was committed by a person acting under color of state law and [2] that the conduct worked a deprivation of rights, privileges, or immunities secured by the Constitution or federal law." *Diaz v. Devlin*, 229 F. Supp. 3d 101, 109 (D. Mass. 2017) (citing 42 U.S.C. § 1983; *Soto v. Flores*, 103 F.3d 1056, 1061 (1st Cir. 1997)). Plaintiff avers that the officers violated her rights conferred by the Fourth Amendment, which guarantees, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The officers do not dispute that they were acting under color of state law on May 27, 2014. However, they argue that they are entitled to summary judgment either because they acted lawfully or, if they did not, qualified immunity bars their liability. For the reasons that follow, there are material facts in dispute which preclude summary judgment for the officers.

      b.     Qualified Immunity

"The principle of qualified immunity shields a police officer from liability for civil damages when his conduct does not violate clearly-established statutory or constitutional rights

of which a reasonable person would have known." *Nuon v. City of Lowell*, 768 F. Supp. 2d 323,

333 (D. Mass. 2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified

immunity balances two important interests — the need to hold public officials accountable when

they exercise power irresponsibly and the need to shield officials from harassment, distraction,

and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223,

231 (2009).

> A two-part framework governs whether a defendant is entitled to qualified immunity.
> First, [the court] inquire[s] whether the facts, taken most favorably to the party opposing
> summary judgment, make out a constitutional violation.  Second, [the court] inquire[s]
> whether the violated right was clearly established at the time that the offending conduct
> occurred.  The second, "clearly established," step itself encompasses two questions:
> whether the contours of the right, in general, were sufficiently clear, and whether, under
> the specific facts of the case, a reasonable defendant would have understood that he was
> violating the right.

*Ford v. Bender*, 768 F.3d 15, 23 (1st Cir. 2014) (citations omitted).  *See Wesby,* 138 S. Ct. at

589-90; *Tolan*, 134 S. Ct. at 1865-66.

The First Circuit has recognized the challenges of applying the qualified immunity

standard at the summary judgment stage.  *See Washington*, 2018 WL 1718629, at *3.

> The difficulty arises because the summary judgment standard requires absolute deference
> to the nonmovant's factual assertions (as long as those assertions are put forward on
> personal knowledge or otherwise documented by materials of evidentiary quality),
> whereas qualified immunity, when raised on summary judgment, demands deference to
> the reasonable, if mistaken, actions of the movant.

*Morelli v. Webster*, 552 F.3d 12, 18–19 (1st Cir. 2009) (internal citations omitted).  "To ease the

difficulty, the First Circuit instructs lower courts to 'first identify[] the version of events that best

comports with the summary judgment standard and then ask[] whether, given that set of facts, a

reasonable officer should have known that his actions were unlawful.'" *Washington,* 2018 WL

1718629, at *3 (alteration in original) (quoting *Morelli*, 552 F.3d at 19).  "[C]ourts may not

10

resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S. Ct. at 1866.

      2.      Count I:  Section 1983 Unreasonable Seizure

In Count I, Plaintiff alleges that Colon and Goudreau violated her Fourth Amendment right to be free from an unreasonable seizure.  *See Peña-Borrero v. Estremeda*, 365 F.3d 7, 12-13 (1st Cir. 2004) ("The Fourth Amendment guarantees individuals 'the right "to be secure in their persons . . . against unreasonable . . . seizures" of the person.'") (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  It is undisputed that Plaintiff was seized in the constitutional sense in the alley behind 87 Newton Street because "a reasonable person would not [have felt] free 'to disregard the police and go about [her] business.'"  *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.,* 499 U.S. 621, 628 (1991)).  The circumstances leading up to the stop present a genuine dispute of material facts such that Plaintiff is entitled to press this claim at trial (Dkt. No. 48 at 9-10; Dkt. No. 58 at 4-6).

A seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ."  *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  "[A]n officer may make a brief investigatory stop of an individual if the officer has reasonable suspicion 'that criminal activity may be afoot.'"  *Foley v. Kiely*, 602 F.3d 28, 31 (1st Cir. 2010) (quoting *United States v. Am,* 564 F.3d 25, 29 (1st Cir. 2009)).  Courts "follow a two-pronged inquiry to evaluate 'whether the officer's action was justified at its inception, and whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place.'"  *Id.* (quoting *Am,* 564 F.3d at 29 (citations omitted)).

To meet the first prong's requirement, courts evaluate whether the officers can point to "a particularized and objective basis for suspecting the person stopped of criminal activity." *United*

*States v. Wright,* 582 F.3d 199, 205 (1st Cir. 2009) (citations and quotations omitted).  "Th[e] particularity requirement means, in effect, that such a finding must be 'grounded in specific and articulable facts.'"  *United States v. Espinoza,* 490 F.3d 41, 47 (1st Cir. 2007) (quoting *United States v. Hensley,* 469 U.S. 221, 229 (1985)).  "The 'objective' component requires courts to 'focus not on what the officer himself believed but, rather, on what a reasonable officer in his position would have thought.'"  *Wright,* 582 F.3d at 205 (quoting *Espinoza,* 490 F.3d at 47).  "The second prong of the inquiry requires [the court] to determine whether the [officers'] actions in connection with the stop were reasonable in light of the totality of the circumstances confronting them at the time of the stop."  *Foley,* 602 F.3d at 32-33 (citing *United States v. McCarthy,* 77 F.3d 522, 530 (1st Cir. 1996)).  Here, the inquiry focuses on the first prong.

Defendants allege that a reasonable officer in Colon's position would have believed that Plaintiff was trespassing or had committed a breaking and entering based on the lack of an answer to the knocks on the locked front door, the noises Morales heard inside 87 Newton Street, Plaintiff's statement that she did not reside there after she exited from that address, and her attempt to avoid Colon.[7]  *See Wesby,* 138 S. Ct. at 587 ("'[U]nprovoked flight upon noticing the

---

[7] The crime of trespass is defined in Mass. Gen. Laws ch. 266, § 120:  "Whoever, without right enters or remains in or upon the . . . improved or enclosed land . . . of another . . . after having been forbidden so to do by the person who has lawful control of said premises, whether directly or by notice posted thereon . . . shall be punished by a fine of not more than one hundred dollars or by imprisonment for thirty days or both such fine and imprisonment."  A locked gate or door provides sufficient notice that trespassing is forbidden.  *See Commonwealth v. Juvenile*, 373 N.E.2d 1202, 1204 (Mass. App. Ct. 1978) ("We are of the opinion that 'directly' as it appears in the statute does not require a person having control of unposted premises to be on those premises at all times of the day or night to ward off intruders.  Rather, he may directly forbid entry to the premises by securing them with fences or walls and locked gates or doors.").  The crime of breaking and entering in the day time with intent to commit a misdemeanor is defined in Mass. Gen. Laws ch. 266, § 16A:  "Whoever in the . . . daytime breaks and enters a building . . . with intent to commit a misdemeanor shall be punished . . . ."  Plaintiff was, of course, never charged with trespassing or breaking and entering.

police . . . is certainly suggestive' of wrongdoing and can be treated as 'suspicious behavior' that factors into the totality of the circumstances.") (quoting *Illinois v. Wardlow,* 528 U.S. 119, 124–25 (2000)).

For her part, Plaintiff contends that Colon lacked reasonable suspicion to detain her. Plaintiff avers that she was not at home when the officers knocked on the door (Dkt. No. 59-3 at 29). After she left her home through the back door, Colon observed her using her key to unlock then lock the gate that separated the backyard of 87 Newton Street from the alley, which indicated that she owned the premises or had a right to be there (Dkt. No. 59-3 at 46, 48; Dkt. No. 59-8 at 3). Before Colon seized her, he had only asked for her name and she had responded, "Milagro" (Dkt. No. 59-3 at 48; Dkt. No. 59-8 at 3). Morales did not indicate that he believed a breaking and entering was in progress when he called for backup and Colon admitted that he had no reason to believe Plaintiff committed a crime when she left the townhouse. Based on these facts, a jury could conclude that Colon "did not have a particularized and objective basis for suspecting that criminal activity was afoot when [he detained Plaintiff]." *Petro v. Town of W. Warwick*, 770 F. Supp. 2d 475, 481 (D.R.I. 2011).

Applying the summary judgment standard to Plaintiff's version of the facts, the court cannot conclude that Colon is entitled to qualified immunity at this stage of the litigation. "[T]he Fourth Amendment right to be free from investigatory stops in the absence of reasonable suspicion was clearly established long before this . . . event occurred." *Eldredge v. Town of Falmouth,* 662 F.3d 100, 106 (1st Cir. 2011). Because Plaintiff alleges that Colon saw her use keys to the gate and because she responded when he asked her name, a reasonable officer in his

position would have recognized that he lacked "a reasonable suspicion that [she] may be involved in criminal activity." *Morelli,* 552 F.3d at 20.

Accordingly, Colon is not entitled to summary judgment on Count I.  However, in view of Plaintiff's allegation that Goudreau did not participate in seizing her because he arrived after Colon made the stop (Dkt. No. 58 at 13-17), he is entitled to summary judgment on Count I.  *See Echavarria v. Roach*, Civil Action No. 16-cv-11118-ADB, 2017 WL 3928270, at *3 (D. Mass. Sept. 7, 2017) ("In a § 1983 case, 'each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.'") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).[8]

   3.  Counts II and Count VII:  Section 1983 False Arrest and Common Law False Arrest and False Imprisonment

    a.  Section 1983 False Arrest (Count II)

---

[8] Principally relying on *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997), Plaintiff also alleges that Morales and Colon seized her when they "encircle[ed] 87 Newton Street and persist[ed] in their efforts to obtain entry despite the clear desire of occupants not to answer the door" (Dkt. No. 58 at 11-13).  Under Plaintiff's version of the facts, however, this claim fails.  The argument is based on the well-settled precept that the occupants of a home are not required to answer a police officer's knock at the door.  *See Kentucky v. King*, 563 U.S. 452, 469–70 (2011). According to Plaintiff, she was not at home when Morales and McNulty knocked and when the locksmith attempted to enter.  She alleges that HG&E personnel were across the street by the time she arrived at her home.  Because Fourth Amendment rights are personal, she lacks standing to assert the rights of the other occupants of her home.  *See Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) ("'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'") (citation omitted).  Plaintiff remained inside only long enough to get the receipt for her friend's bail before she left through the back door.  She further claims that Colon did not block her egress through her back yard and out her gate.  She alleges that the stop occurred after she entered the alley.  Consequently, Morales' and Colon's actions did not constitute a seizure of Plaintiff inside her home.  *Contrast Jerez*, 108 F.3d at 692("[T]he totality of the circumstances surrounding the encounter – the late hour of the episode, the three minutes of knocking on [defendants' motel room] door, the commands and requests to open the door, the one-and-a-half to two minutes of knocking on the outside window, and the shining of the flashlight through the small opening in the window's drapes onto the face of [a defendant] as he lay in bed – makes clear that a seizure took place.").

Plaintiff's false arrest claim in Count II requires a determination of whether or not Plaintiff's warrantless arrest was supported by probable cause as required by the Fourth Amendment. *See Wesby*, 138 S. Ct. at 586 ("A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence."); *Santiago v. Fenton*, 891 F.2d 373, 383 (1st Cir. 1989) ("The Fourth Amendment right to be free from unreasonable seizures of the person demands that an arrest be supported by probable cause.") (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

> [T]he constitutionality of a warrantless arrest "depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it - whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that . . . [Plaintiff] had committed or was committing an offense."

*United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir. 1987) (first alteration original) (quoting *Beck*, 379 U.S. at 91). "To determine whether an officer had probable cause to arrest an individual, [the court] examine[s] the events leading up to the arrest, and then decide[s] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "If probable cause exists to arrest, then there has not been a constitutional deprivation" under § 1983 and Defendant is entitled to qualified immunity. *Sietins v. Joseph*, 238 F. Supp. 2d 366, 375 (D. Mass. 2003). Conversely, it has long been well-established that an arrest without probable cause is a constitutional violation. *See Prokey v. Watkins*, 942 F.2d 67, 74 (1st Cir. 1991). Because Defendants' version of the material facts contradicts Plaintiff's and because the officers are not entitled to qualified immunity under Plaintiff's version, summary judgment is not warranted.

Defendants argue that they had probable cause to arrest Plaintiff for disorderly conduct pursuant to Mass. Gen. Laws ch. 272, § 53 and resisting arrest pursuant to Mass. Gen. Laws ch. 268, § 32B. [9]

A person is guilty of disorderly conduct if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, [s]he: (a) engages in fighting or threatening, or in violent or tumultuous behavior; or . . . (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

---

[9] Mass. Gen. Laws ch. 272, § 53 provides:

Common night walkers, common street walkers, both male and female, common railers and brawlers, persons who with offensive and disorderly acts or language accost or annoy persons of the opposite sex, lewd, wanton and lascivious persons in speech or behavior, idle and disorderly persons, disturbers of the peace, keepers of noisy and disorderly houses, and persons guilty of indecent exposure may be punished by imprisonment in a jail or house of correction for not more than six months, or by a fine of not more than two hundred dollars, or by both such fine and imprisonment.

Mass. Gen. Laws ch. 272, § 53.

In pertinent part, Mass. Gen. Laws ch. 268, § 32B says:

(a) A person commits the crime of resisting arrest if he knowingly prevents or attempts to prevent a police officer, acting under color of his official authority, from effecting an arrest of the actor or another, by:

(1) using or threatening to use physical force or violence against the police officer or another; or

(2) using any other means which creates a substantial risk of causing bodily injury to such police officer or another.

(b) It shall not be a defense to a prosecution under this section that the police officer was attempting to make an arrest which was unlawful, if he was acting under color of his official authority, and in attempting to make the arrest he was not resorting to unreasonable or excessive force giving rise to the right of self-defense. A police officer acts under the color of his official authority when, in the regular course of assigned duties, he is called upon to make, and does make, a judgment in good faith based upon surrounding facts and circumstances that an arrest should be made by him.

Mass. Gen. Laws ch. 268, § 32B.

> "Public" means affecting or likely to affect persons in a place to which the public or a substantial group has access.

*Alegata v. Commonwealth,* 231 N.E.2d 201, 211 (Mass. 1967) (quoting MODEL PENAL CODE § 250.2 (Am. Law Inst., Proposed Official Draft 1962)).  Defendants appear to allege that, when Colon stopped Plaintiff, she violated subsection (a) by refusing to cooperate and by "yelling and screaming" at him (Dkt. No. 48-6 ¶ 11; Dkt. No. 59-7 at 15).  The commotion allegedly attracted a crowd of people who moved closer to Colon and Plaintiff (Dkt. No. 48-6 ¶ 12).  According to Colon, he warned Plaintiff that if she did not "calm down," he would arrest her for disorderly conduct (*id.* ¶ 13).  Her subsequent yelling of obscenities precipitated her arrest (*id.* ¶¶ 14, 15).  *See Commonwealth v. Richards*, 340 N.E.2d 892, 895-96 (Mass. 1976) (defendants in shopping mall refusing to cease public drinking, shouting obscenities, resisting arrest, and attracting crowd of about 200 people hostile and abusive to police warranted disorderly conduct convictions); *Commonwealth v. Sinai*, 714 N.E.2d 830, 834 (Mass. App. Ct. 1999) ("'Tumultuous behavior' is conduct which may be characterized as involving riotous commotion and excessively unreasonable noise so as to constitute a public nuisance. . . . [D]isorderly conduct embraces those activities which intentionally tend to disturb the public tranquility or alarm or provoke others.") (citing *Commonwealth v. A Juvenile*, 334 N.E.2d 617, 628 (Mass. 1975); *Commonwealth v. LePore,* 666 N.E.2d 152, 155 (Mass. App. Ct. 1996)).  Colon and Goudreau contend that Plaintiff's resistance to their attempts to handcuff her by flailing her arms and by slipping out of a handcuff when they attempted to place her under arrest established probable cause for the charge of resisting arrest (Dkt. No. 59-11 at 5; Dkt. No. 60-18 at 4-5).  *See Commonwealth v. Grandison*, 741 N.E.2d 25, 35 (Mass. 2001) (Commonwealth presented sufficient evidence to support conviction for resisting arrest where the defendant "would not bend his arms to allow the

handcuffs to be placed on him and he managed to pull his arm away for a few seconds.  It took four police officers to handcuff him.").

The court, however, accepts Plaintiff's account of the events at this stage.  She avers that although she used a loud voice when she told Colon not to touch her, she did not yell, scream, or swear at him, and did not struggle with him and Goudreau (Dkt. No. 59-3 at 49, 53, 74-75).  Instead, she asserts, she "fully complied" with their orders (*id.* at 74-75).  These facts are insufficient to establish probable cause to arrest Plaintiff for disorderly conduct or resisting arrest.  Accordingly, neither Colon nor Goudreau is entitled to qualified immunity as to Plaintiff's claims that her arrest violated her Fourth Amendment rights.  *See Prokey*, 942 F.2d at 71 (summary judgment was properly denied where the "disputed facts and inferences must be resolved by a fact finder in order to determine whether or not, as defendants contend, a reasonably competent officer could have found probable cause in these circumstances.").

> b.      Common Law False Arrest and False Imprisonment (Count VII)

To establish both false arrest and false imprisonment, Plaintiff must prove that she was arrested without probable cause.  *See Eason v. Alexis*, 824 F. Supp. 2d 236, 241 (D. Mass. 2011) ("To maintain a cause of action for false arrest under Massachusetts law, a plaintiff must establish that 1) the defendant arrested the plaintiff and 2) without probable cause.") (citing *Lucas v. City of Boston,* Civil Action No. 07–cv–10979–DPW, 2009 WL 1844288, at *25 (D. Mass. June 19, 2009)); *Goddard v. Kelley*, 629 F. Supp. 2d 115, 129 (D. Mass. 2009) ("A police officer is liable for false imprisonment if he arrests, or causes the arrest, of the plaintiff, without probable cause.").  Because, if proved, Plaintiff's version of events establishes that her arrest was without probable cause, Defendants are not entitled to summary judgment on Count VII.

> 4.      Counts III and VI:  Section 1983 Excessive Force and Common Law
> Assault and Battery

a.   <mark>Section 1983 Excessive Force (Count</mark> III)

In Count III, Plaintiff claims that the officers used excessive force to effectuate her arrest. Specifically, Goudreau took her down to the ground, then employed the drive stun mode of his Taser twice in the course of the arrest.  "Where an excessive force claim arises in the context of an arrest, the claim 'must be analyzed in light of the Fourth Amendment's prohibition of unreasonable searches and seizures.'"  *LaFrenier v. Kinirey,* 478 F. Supp. 2d 126, 137-38 (D. Mass. 2007) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 205 (1st Cir. 1990) (per curiam)).  "In order to establish a Fourth Amendment claim based on alleged excessive use of force, Plaintiff must show (1) that there was a 'seizure' within the meaning of the Fourth Amendment; and that (2) the use of force during the seizure was unreasonable under the circumstances."  *McCormack v. Town of Whitman*, Civil Action No. 10-10461-PBS, 2013 WL 1187093, at *7 (D. Mass. Mar. 20, 2013) (footnote omitted) (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)).  That Plaintiff was seized at the time Goudreau grabbed her and employed his Taser twice is undisputed.  Consequently, the question is whether or not the officers' use of force was reasonable under the circumstances.  *See Bettencourt v. Arruda*, Civil Action No. 10-11487-JGD, 2012 WL 5398475, at *8 (D. Mass. Nov. 1, 2012) (quoting *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010)).  Because the material facts surrounding Goudreau's employment of his Taser are controverted, the officers are not entitled to summary judgment.

"The reasonableness inquiry is objective, to be determined 'in light of the facts and circumstances confronting [the officers] without regard to [their] underlying intent or motivation.'"  *Jennings v. Jones,* 499 F.3d 2, 11 (1st Cir. 2007) (quoting *Graham,* 490 U.S. at 397).

> This determination requires [the court] to balance the individual's interest against the government's, weighing three non-exclusive factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."

*Raiche*, 623 F.3d at 36 (alteration in original) (quoting *Graham,* 490 U.S. at 396); *see also Tolan*, 134 S. Ct. at 1865; *Morelli,* 552 F.3d at 23. Here, the factual dispute centers on Plaintiff's behavior that precipitated Goudreau's employment of his Taser. *See Roach v. Green*, CIVIL ACTION NO. 14-13515-RGS, 2016 WL 1254236, at *4 (D. Mass. Mar. 29, 2016) ("[T]here are legitimate disputes of fact about the degree of [Plaintiff's] resistance to arrest, the level of [her] hostility and combativeness toward the officers, whether [s]he presented an appreciable threat to the officers' safety . . . and whether the deployment of the Taser was appropriate under circumstances in which [two] officers confronted a single [diminutive] defendant.").

Defendants contend that after one of Plaintiff's hands slipped out of the handcuffs, her attempts to ward them off by flailing her arms with a handcuff still attached to one wrist while yelling obscenities necessitated Goudreau's application of his Taser's drive stun mode to the back of her right arm (Dkt. No. 48-5 at 5; Dkt. No. 48-6 ¶¶ 19-25; Dkt. No. 48-9 ¶¶ 7-12; Dkt. No. 59-7 at 29). Goudreau employed his Taser's drive stun mode again when Plaintiff allegedly disregarded the officers' commands to place both of her hands behind her back and continued to resist the officers' efforts to handcuff her (Dkt. No. 48-6 ¶¶ 27-30; Dkt. No. 48-9 ¶¶ 14-17).

According to Plaintiff, the officers did not apply the handcuffs before Goudreau tased her (Dkt. No. 59-3 at 59, 66, 67). Plaintiff was not resisting the officers' attempts to handcuff her when Goudreau pushed her chest with both hands, told her that he intended to use his Taser, swept her legs out from under her, and tased her arm (*id.* at 56-59, 63-64). She was motionless when he deployed his Taser on her the second time (*id.* at 64, 65). Plaintiff's expert opined that

Goudreau's "use of the Taser was unnecessary, excessive, and contrary to accepted police practices . . . " (Dkt. No. 60-14 at 19). *See Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008) ("The use of expert testimony is permissible in assisting the jury in evaluating claims of excessive force.").  According to Plaintiff's account, after the officers handcuffed her, one hand slipped out of the handcuffs (*id.* at 67, 69-72).

"Viewing the facts in the light most favorable to [Plaintiff], a reasonable jury could find that the officers' use of force, including the Taser, to effect the arrest, violated [Plaintiff's] rights under the Fourth Amendment." *Roach*, 2016 WL 1254236, at *4.  *Compare Parker,* 547 F.3d at 10-11 (jury was warranted in finding that the officer's use of his Taser was unreasonable where plaintiff was compliant and was not actively resisting the officer); *Bettencourt*, 2012 WL 5398475, at *9 (officer used excessive force where "[t]he facts presented by [the plaintiff] show that at the time of the alleged use of force, [he] was not engaged in any criminal activity and was not acting in a manner that would have posed a threat to [the defendant] or anyone else at the scene.  Furthermore, there is no evidence indicating that [the plaintiff] ever resisted or attempted to evade arrest.").

The officers' reliance on *Isom v. Town of Warren*, 360 F.3d 7 (1st Cir. 2004), is misplaced.  In *Isom*, the court found that an officer's use of pepper spray in an attempt to subdue the plaintiff's axe-wielding son was objectively reasonable when the man refused to put down the axe, then charged the officers with the axe after being sprayed with pepper spray.  *Id.* at 9-12.  In the instant case, on the other hand, according to Plaintiff, she was unarmed and was not resisting the officers when Goudreau employed his Taser.

Based on Plaintiff's statement of facts, the officers are not protected by qualified immunity at this stage of the litigation.  *See Roach*, 2016 WL 1254236, at *5 (denying the claim

of qualified immunity "[b]ecause of the unresolved factual disputes regarding the officers' use of force."); *Robinson v. Cook*, 863 F. Supp. 2d 49, 62 (D. Mass. 2012) ("Because . . . there are disputed issues of material fact regarding the question of qualified immunity, neither party is entitled to summary judgment with respect to the excessive force claim."). Accordingly, Colon and Goudreau are not entitled to summary judgment on Count III.

   b. Common Law Assault and Battery (Count VI)

   In Count VI, Plaintiff alleges that Colon and Goudreau are liable for assault and battery. "Assault and battery is the 'intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another.'" *Sietins*, 238 F. Supp. 2d at 380 (quoting *Jesionowski v. Beck*, 937 F. Supp. 95, 105 (D. Mass. 1996)). In Massachusetts, "an officer authorized to make an arrest may use 'such force as is reasonably necessary to effect the arrest.'" *Julian v. Randazzo*, 403 N.E.2d 931, 934 (Mass. 1980). Where, as here, "a plaintiff alleges both § 1983 excessive force claim and common law claims for assault and battery, [the] determination of reasonableness of the force used under § 1983 controls [the] determination of the reasonableness of the force used under the common law assault and battery claims." *Raiche*, 623 F.3d at 40. Because, as detailed above, the relevant facts relating to the use of excessive force against Plaintiff are in dispute, and, accepting as true Plaintiff's version of events, a reasonable finder of fact could conclude that the officers used force beyond that necessary to effectuate an arrest. The motion for summary judgment, therefore, must be denied with respect to the assault and battery claim.

   5. Count IV:  Section 1983 Failure to Intervene

   Although Count IV's claim for failure to intervene alleges wrongdoing by both officers (Dkt. No. 6 at 8), Plaintiff's argument against summary judgment focuses on Colon's failure to

intervene when Goudreau used his Taser the second time (Dkt. No. 58 at 19 n.12).  Defendants make no argument supporting their request for summary judgment on this claim.  Consequently, to the extent they are requesting summary judgment in Colon's favor, their request is denied.

"An officer may be held liable [under § 1983] not only for his personal use of excessive force, but also for his failure to intervene in appropriate circumstances to protect an arrestee from the excessive use of force by his fellow officers."  *Wilson v. Town of Mendon*, 294 F.3d 1, 6 (1st Cir. 2002) (citing *Gaudreault,* 923 F.2d at 207 n.3).  *See also Calvi v. Knox Cty.*, 470 F.3d 422, 428 n.3 (1st Cir. 2006) ("[A] bystander-officer who has a realistic opportunity to prevent the use of excessive force by a fellow officer may in certain circumstances be held liable for a failure to intervene.").  Liability under this theory stems from the state's "duty in some circumstances to intervene to protect arrestees . . ." from the excessive use of force.  *Davis v. Rennie*, 264 F. 3d 86, 98 (1st Cir. 2001).  *See O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.").

In order to establish an officer's liability for failing to intervene, Plaintiff must show that the officer:  (1) "was present when excessive force was used;" (2) "observed the use of excessive force;" (3) "was in a position where he . . . could realistically prevent that force;" and (4) "had sufficient time to do so."  *Davis,* 264 F.3d at 102.  Applying these elements to Plaintiff's version of the events, Colon is not entitled to summary judgment.  He was near Goudreau when Goudreau used his Taser on Plaintiff's arm, observed its use, and could have prevented him from employing it a second time on Plaintiff's back.  There is no dispute that Goudreau announced that he was going to tase Plaintiff before he applied his Taser the second time.  According to the

record, a time interval separated the first and second applications.  Consequently, a reasonable jury could find that Colon had a realistic opportunity to intervene and failed to do so.

Colon is not entitled to qualified immunity.  "[T]he law was clearly established in 1998 that an officer in [his] circumstances had a duty to intervene."  *Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 55 (1st Cir. 2005).  *Contrast Echavarria*, 2017 WL 3928270, at \*11 (granting officers qualified immunity for failure to intervene where it was "uncertain whether an officer has a duty to intervene in cases that do not concern excessive force.").

Accordingly, Colon's motion for summary judgment as to Count IV, charging failure to intervene, is denied.  Because Plaintiff appears to agree that Goudreau is entitled to summary judgment on this count, the claim against Goudreau will not go forward.

> 6.    Counts VIII and IX:  Common Law Malicious Prosecution and Abuse of Process

> a.    Common Law Malicious Prosecution (Count VIII)

To prevail on a claim of malicious prosecution [under Massachusetts law], a plaintiff must prove:  "(1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice." *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001) (citing *Correllas v. Viveiros,* 572 N.E.2d 7, 10 (Mass. 1991)).  The parties' dispute focuses on the elements of probable cause and malice.

For the reasons previously discussed, Plaintiff's version of events supports the view that the officers lacked probable cause for her arrest.  As to the fourth element, malice is defined as "'any wrong or unjustifiable motive.'"  *Campbell v. Casey*, 166 F. Supp. 3d 144, 153 (D. Mass. 2016) (quoting *Limone v. United States*, 579 F.3d 79, 89 (1st Cir. 2009)).  "It may be inferred from a lack of probable cause."  *Id.  See also Gouin v. Gouin*, 249 F. Supp. 2d 62, 71 (D. Mass.

2003) ("The malice element of malicious prosecution requires that the accuser knew there was

no probable cause for the commencement of the action, and that the accuser acted with an

improper motive.") (citing *Beecy v. Pucciarelli,* 387 Mass. 589, 593 (Mass. 1982)).  In addition,

an improper motive may be inferred from Goudreau's use of his Taser without provocation.  *See*

*Goddard*, 629 F. Supp. 2d at 132.  Because a genuine dispute of material fact exists as to the

elements of malicious prosecution, the officers' motion for summary judgment on Count VIII is

denied.

> b.     Common Law Abuse of Process (Count IX)

Plaintiff contends that the officers pursued charges against her as a preemptive strike

against her anticipated civil rights claims (Dkt. No. 58 at 20-21).  The officers counter that there

is no evidence that "the police officers' reports were crafted with some malicious intent" (Dkt.

No. 48 at 20).  The officers' argument lacks force.

"In Massachusetts, a claim for abuse of process lies where a police officer brings criminal

charges against a defendant for 'an ulterior or illegitimate purpose.'"  *Eason*, 824 F. Supp. 2d at

243 (quoting *Gutierrez v. Mass. Bay Transp. Auth.,* 772 N.E.2d 552, 563 (Mass. 2002)).  "The

elements of an abuse of process claim are (1) the defendant used 'process' (2) for an ulterior or

illegitimate purpose (3) resulting in damage."  *Cabot*, 241 F. Supp. 3d at 259 (citing *Millennium*

*Equity Holdings, LLC v. Mahlowitz*, 925 N.E.2d 513, 522 (Mass. 2010)).

"[A]n ulterior motive is an essential element of the tort of abuse of process when the

claim is based solely on commencement of an action."  *Ladd v. Polidoro*, 675 N.E.2d 382, 384

(Mass. 1997).  An ulterior motive "is not simply the intent to harm the other party directly by

bringing suit, but rather the intent to gain some other end indirectly."  *Psy–Ed Corp. v. Klein,*

947 N.E.2d 520, 535 n.35 (Mass. 2011).  "There must be an ulterior purpose '"to gain some

collateral advantage," which "has been compared to extortion, in that the defendant has allegedly tried to extract some advantage by wrongful means."'" *Cardoso v. City of Brockton*, Civil Action No. 12-10892-DJC, 2014 WL 6698618, at *18 (D. Mass. Aug. 11, 2014) (quoting *Damon v. Hukowicz,* 964 F. Supp. 2d 120, 141 (D. Mass. 2013)).

> "[I]t is immaterial that the process was properly issued, that it was obtained in the course of proceedings which were brought with probable cause and for a proper purpose or even that the proceedings terminated in favor of the person instituting or initiating them. The subsequent misuse of the process, though properly obtained, constitutes the misconduct for which the liability is imposed . . . ."

*Quaranto v. Silverman,* 187 N.E.2d 859, 861 (Mass. 1963) (quoting RESTATEMENT (FIRST) OF TORTS § 682 cmt. a (AM. LAW INST. 1938)).

Plaintiff alleges that the officers falsified their police reports in order to obtain a criminal complaint "to protect themselves from civil liability" (Dkt. No. 26 ¶¶ 39, 40; Dkt. No. 58 at 21). "The law is clear that, even where probable cause exists to arrest, an abuse of process claim may still survive where there is evidence that 'the officers' reports intentionally exaggerated the gravity of the situation so that the prosecutor would be more likely to press charges.'" *Hutchins v. McKay*, 285 F. Supp. 3d 420, 429 (D. Mass. 2018) (quoting *Gutierrez*, 772 N.E.2d at 563).

The officers' police reports are generally consistent with their version of events and at odds with Plaintiff's. Colon's narrative report stated: upon seeing him, Plaintiff walked down the alley at a fast pace; told him she did not live at 87 Newton Street; refused to tell him why she was there; then yelled, screamed and "caused a commotion," which attracted people; yelled obscenities at Colon when he threatened to arrest her; and flailed her arms and resisted arrest (Dkt. No. 59-10). Goudreau's description of Plaintiff's behavior was consistent with Colon's (Dkt. No. 60-16). He reported that after he assisted Colon in handcuffing Plaintiff, one of her hands slipped out of the handcuffs and "she began struggling again" and was yelling obscenities

(*id.*).  This prompted him to use his Taser (*id.*).  Her continued resistance necessitated his use of

his Taser a second time (*id.*).  According to Goudreau, Plaintiff "tried to pull away" while the

officers were escorting her to the cruiser and she "kept acting out" while he transported her to the

police station (*id.*).  If a jury were to credit Plaintiff's version of events and her claim that the

officers falsified their reports in an effort to conceal the false arrest and their use of excessive

force, she would establish the ulterior motive element of the abuse of process claim.  *See*

*Hutchins*, 285 F. Supp. 3d at 429 (denying summary judgment where the officer's description of

the scene was "dramatically different" from the plaintiff's); *Lund v. Henderson*, 22 F. Supp. 3d

94, 109 (D. Mass. 2014) (denying summary judgment on abuse of process claim where plaintiff

alleged that officer falsified his police report to cover up the actions of another officer who

injured plaintiff); *Philbrook v. Perrigo*, 637 F. Supp. 2d 48, 54-55 (D. Mass. 2009) (denying

summary judgment on abuse of process claim where it was reasonable to infer that officers

initiated process to cover up their wrongful arrest of the plaintiff).

 The veracity of the police reports presents a genuine issue of material fact.  Accordingly,

the officers' motion for summary judgment on Count IX, the abuse of process claim, is denied.

 C. <u>Count X:  Section 1983 Claim against Morales for Unlawful Entry into Plaintiff's</u>
   <u>Home</u>

 In Count X, Plaintiff asserts a claim under § 1983 based on Morales' allegedly unlawful

entry into her home while she was at the police department.  Specifically, she alleges that the

officer used her keys to enter her home without her consent and without a warrant.  Morales

counters that he did not enter 87 Newton Street to perform an investigative function and, in any

event, an "unidentified civilian" used Plaintiff's keys to open the door to her home and consented

to Morales' and McNulty's entry (Dkt. No. 48 at 16; Dkt. No. 48-7 ¶ 16; Dkt. No. 49 ¶ 44).  At

the summary judgment stage of litigation, Plaintiff's version of the facts controls and Morales is not entitled to qualified immunity.

Because Plaintiff was not present when Morales and McNulty entered her residence, the circumstances surrounding the entry are gleaned from the radio transmissions and the officers' deposition testimony, answers to interrogatories, narrative reports, and affidavits. There is no dispute that: Plaintiff's account with HG&E was in arrears; HG&E notified Plaintiff that they would enter her residence on May 27, 2014 to terminate her service and "a *police officer* [would] be present at the time of entry" (emphasis original); the doors to Plaintiff's home at 87 Newton Street were locked and no one opened the door in response to McNulty's and Morales' knocks; after Plaintiff's arrest, her mother informed Morales that Plaintiff had the keys to her home;[10] Morales directed officers to bring Plaintiff's keys to 87 Newton Street; and Colon complied (Dkt. No. 48-7 ¶ 6; Dkt. No. 59-4 at 11, 17-18; Dkt. No. 60-5; Dkt. No. 60-6 at 14, 22; Dkt. No. 63, Ex. 1 at 14.28.04, 14.30.27). According to Colon, Morales and McNulty "gained entry to 87 Newton Street by using" a key that was recovered from Plaintiff at booking (Dkt. No. 48-5 at 6).

The Massachusetts statutes that regulate utility shut-offs are relevant to determining whether Morales' entry violated Plaintiff's Fourth Amendment rights. Section 124 of Mass. Gen. Laws ch. 164 authorizes gas or electric company employees to enter the premises to terminate service for the failure to pay. *See* Mass. Gen. Laws ch. 164, § 124.[11] If a gas or electric

---

[10] Although Plaintiff challenges the legality of her arrest, she did not address the seizure of her keys when she was booked at the police department. *See Illinois v. Lafayette*, 462 U.S. 640, 648 (1983) (permitting inventory of personal property incident to a lawful arrest).

[11] In pertinent part, Mass. Gen. Laws ch. 164, § 124 says:

> Except as otherwise provided in this chapter, a gas or electric company may stop gas or electricity from entering the premises of any person failing to pay the amount due therefor or for the use of the meter or instrument necessary to measure supply of service;

company employee is prevented from entering a premises, the procedure described in Mass. Gen.

Laws ch. 164, § 116 is employed.  *See Commonwealth v. Doherty*, No. 13-P-578, 2014 WL

1686806, at *1 (Mass. App. Ct. Apr. 30, 2014) (unpublished).  Specifically:

> if any person, directly or indirectly, prevents or hinders such [employee] from so entering such premises . . . the gas or electric company . . . may make complaint to any court or magistrate authorized to issue criminal process, who may thereupon issue a warrant directed to the sheriff or to any of his deputies, or to a constable of the town where such company is located,[12] commanding him to take sufficient aid and repair to said premises accompanied by a duly authorized officer or servant, who shall examine such meters, pipes, wires, fittings and works for supplying or regulating the supply of gas or electricity, and ascertain the quantity of gas or electricity consumed or supplied therein, and shall, if required, remove any meters, pipes, wires, fittings and works belonging to said company.

Mass. Gen. Laws ch. 164, § 116.  *See Doherty*, 2014 WL 1686808, at *1 (Section 116 "provides

for warrants to allow the sheriff or his deputies or a constable to 'take sufficient aid' to allow an

employee of a utility company to enter on private premises where there is equipment owned by

the company.") (quoting Mass. Gen. Laws ch. 164, § 116).

---

> and for such purpose, the officers, servants or workmen thereof may, after three days' notice by mail, exclusive of Saturdays, Sundays and legal holidays, enter his premises between the hours of eight in the forenoon and four in the afternoon and separate and take away such meter or other property of the company, and may disconnect any meter, pipe, wires, fittings or other works, whether they are property of the company or not, from its mains, pipes or wires. . . .

Mass. Gen. Laws ch. 164, § 124.

[12]

> The chief and other police officers of all cities and towns shall have all the powers and duties of constables except serving and executing civil process.  They shall suppress and prevent all disturbances and disorder. . . . They may examine all persons abroad whom they have reason to suspect of unlawful design, and may demand of them their business abroad and whither they are going; may disperse any assembly of three or more persons, and may enter any building to suppress a riot or breach of peace therein . . . .

Mass. Gen. Laws ch. 41, § 98.

Viewing the facts in the light most favorable to Plaintiff, she has adequately supported a violation of her Fourth Amendment rights based on Morales' entry into her residence.  "[W]hen it comes to the Fourth Amendment, the home is first among equals."  *Florida v. Jardines*, 569 U.S. 1, 6 (2013).  Section 124 permitted HG&E to enter Plaintiff's residence to terminate service between 8:00 A.M. and 4:00 P.M..  *See* Mass. Gen. Laws ch. 164, § 124.  However, Morales and McNulty of HG&E were "prevent[ed] or hinder[ed]" from entering because no one responded to their knocks at the front door and the locksmith was unable to unlock it (Dkt. No. 48-7 ¶ 6; Dkt. No. 59-4 at 10-11, 13-14; Dkt. No. 60-6 at 15-16).  Mass. Gen. Laws ch. 164, § 116.  Consequently, Mass. Gen. Laws ch. 164, § 116 required HG&E to apply for a warrant from "any court or magistrate authorized to issue criminal process."  Mass. Gen. Laws ch. 164, § 116.  The judicial officer could issue a warrant "directed to" the Holyoke police "commanding" them to accompany the HG&E employee onto the premises to terminate service.  Mass. Gen. Laws ch. 41, § 98; Mass. Gen. Laws ch. 164, § 116.  *See Commonwealth v. Cote*, 444 N.E.2d 1282, 1286 (Mass. App. Ct. 1983) (Greaney, J.).  Entry without a warrant obtained pursuant to § 116 constituted a constitutional violation.

Recently, District Judge Michael A. Ponsor addressed the argument that officers engaged in a non-investigatory function did not violate a plaintiff's rights by entry into the home.  In order to keep the peace, the police officers in *Hutchins* accompanied a mother to the premises while she retrieved her son from the child's father.  *See Hutchins,* 285 F. Supp. 3d at 423.  In rejecting the officers' claim that their entry was lawful, the judge stated:  "[t]he fact that the officers were not actively investigating a crime would not justify an unreasonable intrusion onto Plaintiff's property . . . .  Such a rule would create a gaping hole in Fourth Amendment protections, and no authority supports it."  *Id.* at 426.  *See Camara v. Municipal Court*, 387 U.S. 523, 530 (1967)

30

(Fourth Amendment's personal privacy protections are not limited to searches for evidence of a crime). Judge Ponsor further indicated that if the officers' entry was unlawful, they would not be protected by qualified immunity. [13] *See Hutchins,* 285 F. Supp. 3d at 427 ("To hold in these circumstances that the officers did not violate any clearly established constitutional rule would be a betrayal of the bedrock principle at the foundation of the Fourth Amendment, the protection of the home.").

Similarly, Morales is not entitled to qualified immunity at this time based on his warrantless and nonconsensual entry into Plaintiff's home. It is axiomatic that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . ." *United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972). "[T]he Fourth Amendment requires police officers to secure a warrant prior to effecting a non-consensual entry into a person's residence." *MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir. 2014) (citing *Georgia v. Randolph,* 547 U.S. 103, 109 (2006)). Because Morales did not have either a warrant or consent, his entry would be lawful only if it fell "within some recognized exception to the warrant requirement." *Id.* Morales' argument -- that his warrantless entry was reasonable because his "involvement was to ensure that peace would be maintained during [HG&E's] termination of the gas supply" -- appears to be based on the community caretaking or special needs exceptions to the warrant requirement (Dkt. No. 48 at 16). His position, however, is legally untenable in view of the settled law governing these exceptions.

---

[13] Because *Hutchins* presented a factual question regarding whether or not the officers reasonably believed that they entered the defendant's home as opposed to a common area of the premises, the plaintiff's motion for summary judgment was denied. *See Hutchins*, 285 F. Supp. 3d at 425-26.

"Community caretaking functions include public service and public safety activities performed by the police that are 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Commonwealth v. Suters*, 60 N.E.3d 383, 389 n.5 (Mass. App. Ct. 2016) (quoting *Commonwealth v. Evans,* 764 N.E.2d 841, 844 (Mass. 2002); quoting *Cady v. Dombrowski,* 413 U.S. 433, 441 (1973)). The community caretaking exception requires "first, a reasonably perceived duty on the part of the officer to approach the residence in the name of safety . . .; second, an attempt by officers to announce themselves prior to entering; and third, the absence of occupants to grant or deny officers permission to enter." *Hutchins*, 285 F. Supp. 3d at 427. Here, there are no facts to support the community caretaking exception. At the time Morales entered, there was no reasonable belief that anyone inside 87 Newton Street was in danger and there were occupants who could have chosen to respond to his request to enter. *See id.* (officers were not entitled to qualified immunity for their potentially unlawful entry into the defendant's home on the basis of the community caretaking exception to the warrant requirement where "[n]o evidence presented itself of any problem whatsoever requiring a non-investigative inquiry."). Consequently, a police officer in Morales' position could not have "'reasonably but mistakenly concluded'" that he was engaged in a community caretaking function. *Wesby*, 138 S. Ct. at 591 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

The law is also clear that the special needs exception would not excuse the officer's warrantless, nonconsensual entry. "Search regimes where no warrant is ever required may be reasonable where "'special needs . . . make the warrant and probable-cause requirement impracticable,'" and where the 'primary purpose' of the searches is '[d]istinguishable from the general interest in crime control . . . .'" *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452

(2015) (alteration in original) (citations omitted).  Like all searches, "the fundamental concern of

Fourth Amendment jurisprudence . . . in 'special need' search[es] . . . is whether an established

search procedure is 'reasonable' in light of the actual circumstances in the particular case."

*McCabe v. Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 546 (1st Cir. 1996).  "'Reasonableness,'

in turn, depends on "'balanc[ing] the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the importance of the governmental interests alleged to justify the

intrusion."'"  *Id.* at 546-47 (alteration in original) (quoting *O'Connor v. Ortega,* 480 U.S. 709,

719 (1987)).

      The special needs exception permits warrantless entries into homes only where the court

determines, as a threshold matter, the existence of "special [state] needs, beyond the normal need

for law enforcement . . . ."  *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J.,

concurring).  *See Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665–66 (1989)

("[W]here a Fourth Amendment intrusion serves special governmental needs, beyond the normal

need for law enforcement, it is necessary to balance the individual's privacy expectations against

the Government's interests to determine whether it is impractical to require a warrant or some

level of individualized suspicion in the particular context.").  A compelling state interest along

with a court order or an occupant's lower expectation of privacy are common factors in cases

where the special needs exception has excused the warrant requirement for entries into

residences.  *Compare Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (warrantless entry of a

probationer's home was permitted where "[a] [s]tate's operation of a probation system, like its

operation of a school, government office or prison, or its supervision of a regulated industry, . . .

presents 'special needs' beyond normal law enforcement that may justify departures from the

usual warrant and probable cause requirements."); *Henderson v. City of Simi Valley*, 305 F.3d

1052, 1057 (9th Cir. 2002) (the state's interest in enforcing a court's order issued under the

Domestic Violence Prevention Act supported a special needs exception permitting officers'

warrantless entry into plaintiff's home with her minor child to collect her belongings); *McCabe*,

77 F.3d at 547 (warrantless entry into the home of a mentally ill person to enforce an involuntary

civil commitment order was justified based on "the State's *parens patriae* and 'police power'

interests in ensuring that 'dangerous' mentally ill persons not harm themselves or others . . . .");

*United States v. Cardona*, 903 F.2d 60, 68 (1st Cir. 1990) (upholding warrantless entry of a

parolee's home based on the state's interest in post-conviction monitoring).  None of these factors

were present here.

 A police officer in Morales' position could not have reasonably believed that a state

interest supported application of the special needs doctrine to excuse the warrant requirement.

*See Wesby,* 138 S. Ct. at 589-90; *Saucier v. Katz,* 533 U.S. 194, 202 (2001); *Cote*, 444 N.E.2d at

1285-86 (HG&E was not a state agency for purposes of the Fourth Amendment).  It is well-

settled that Plaintiff was not required to respond to McNulty's and Morales' knock at her door.

*See King*, 563 U.S. at 469-70 ("When law enforcement officers who are not armed with a

warrant knock on a door, they do no more than any private citizen might do.  And whether the

person who knocks on the door and requests the opportunity to speak is a police officer or a

private citizen, the occupant has no obligation to open the door or to speak.").  In view of clearly

established Fourth Amendment law surrounding the sanctity of the home and the Massachusetts

statute that required HG&E personnel to obtain a court-issued warrant if their entry to terminate

gas and electric service was "hindered" and they needed the assistance of law enforcement, a

reasonable officer in Morales' position "could not have thought that [his] actions were lawful."

*MacDonald*, 745 F.3d at 14.  Accordingly, he is not entitled to qualified immunity on Count X.

D.  <mark>Count V:  Federal Claim against the City under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)</mark>

The City has moved for summary judgment as to Count V of Plaintiff's first amended complaint by which Plaintiff seeks damages against the City for deprivation of her constitutional rights.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

> Under *Monell* and its progeny, local governments can be held liable for alleged constitutional deprivations when those deprivations arise from a governmental policy or practice.  In addition to establishing a constitutional deprivation, the plaintiff must show that: (1) the municipality had a custom, policy, or practice of failing to investigate, discipline, supervise, or train its officers; (2) this custom, policy, or practice was such that it demonstrated a "deliberate indifference" to the rights of those citizens with whom its officers came into contact; and (3) the custom, policy, or practice was the direct cause of the alleged constitutional violation.

*Cox v. Murphy*, Civil No. 12-11817-FDS, 2016 WL 4009978, at *7 (D. Mass. Feb. 12, 2016) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Monell*, 436 U.S. at 690-92; *DiRico v. City of Quincy*, 404 F.3d 464, 468-69 (1st Cir. 2005)).

Plaintiff has alleged that the City "developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in Holyoke" and "did not require appropriate in-service training or re-training of officers who were known to use excessive and unnecessary force during street encounters with civilians" (Dkt. No. 26 ¶¶ 62, 63, 64). Plaintiff initially challenged the City's training of police officers on their use of Tasers. Plaintiff's counsel informed the court at the motion hearing that, after obtaining discovery, she was no longer pursuing that claim.  The Holyoke Police Department's Use of Force Policy described the training protocol for officers who were authorized to carry a Taser (Dkt. No. 48-4 at 8).  Goudreau was aware of the department's Taser policy, was initially certified to use a Taser, and was recertified thereafter (Dkt. No. 48-9 ¶¶ 20, 21; Dkt. No. 60-17 at 32-34).

<mark>Plaintiff now faults the City for failing to train or instruct its police officers</mark> on the procedures to employ when participating in the termination of utility services and alleges that the

City's deliberate indifference caused the officers to violate her constitutional rights (Dkt. No. 58 at 21-22). The City argues that Plaintiff failed to sustain her burden of demonstrating a causal connection between the absence of a policy or training and the alleged unlawful entry into her home (Dkt. No. 62 at 2). According to the City, the practice officers were supposed to follow when keeping the peace during a utility shut off absolves it of liability (Dkt. No. 48 at 6). The City's argument is persuasive.

"The Supreme Court, concerned that municipal liability based on fault by the City might collapse into de facto *respondeat superior*, has set a very high bar for assessing municipal liability under *Monell*." *Young v. City of Providence*, 404 F.3d 4, 26 (1st Cir. 2005). Accordingly, "a training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." *Id.* at 27 (citing *City of Canton*, 489 U.S. at 391; *Grazier v. City of Philadelphia*, 328 F.3d 120, 125 (3d Cir. 2003); *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997)). "While all reasonable inferences are to be drawn in Plaintiff's favor at this juncture, it is Plaintiff's burden to demonstrate a causal link between an alleged failure to train police officers adequately and the claimed constitutional violation." *Douglas v. City of Springfield*, C.A. No. 14-30210-MAP, 2017 WL 123422, at *7 (D. Mass. Jan. 12, 2017) (citation omitted) (citing *Young*, 404 F.3d at 9).

There is no dispute that the City did not have a written policy on shut-off procedure and did not offer training. "When a plaintiff points to no specific unconstitutional policy . . . as is the case here, a claim of municipal liability must be grounded in a custom as evidenced by widespread action or inaction by public officials." *Alston v. Town of Brookline*, CIVIL ACTION NO. 15-13987-GAO, 2018 WL 1586024, at *16 (D. Mass. Mar. 30, 2018) (citing *McElroy v.*

36

*City of Lowell*, 741 F.Supp.2d 349, 353 (D. Mass. 2010); *Fletcher v. Town of Clinton*, 196 F.3d 41, 55 (1st Cir. 1999)).  "The First Circuit has explained the difference between official policy and unofficial custom: '[u]nlike a "policy," which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up." *Id.* (alteration in original) (internal citation omitted) (quoting *Baron v. Suffolk Cty. Sheriff's Dept.*, 402 F.3d 225, 236 (1st Cir. 2005), *abrogated on other grounds by Jennings v. Jones*, 587 F.3d 430 (1st Cir. 2009)).  Morales, who had participated in "numerous" shut-offs, explained the department's practice or custom in the event occupants of a residence refused to open the door to permit the utility personnel and the police to enter to terminate the services by stating that "[t]here is not much you can do if they refuse.  If they don't open the door, we just leave" (Dkt. No. 59-4 at 9-10, 13, 22).  This practice meets the definition of a "custom" and Plaintiff does not argue to the contrary.  It is a custom that is not violative of residents' Fourth Amendment rights.

Plaintiff has not established a "'direct causal link'" between the City's custom when participating in utility shut-offs and the deprivation of her constitutional right.  *Alston,* 2018 WL 1586024, at *16 (quoting *Bd. of the Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997)).  If Morales had followed the standard practice, he would not have entered.  The fact that Morales did not follow this practice does not make the City liable.  "[A] 'single incident' of misconduct, without other evidence, cannot provide the basis for municipal liability under § 1983.  Such a result would be the equivalent of imposing *respondeat superior* liability upon the municipality." *Bordanaro v. McLeod*, 871 F.2d 1151, 1161 n.8 (1st Cir. 1989) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24 (1985)).

Plaintiff has not established the City's liability for any § 1983 claim.  Accordingly, summary judgment is granted on Count V.

IV.    CONCLUSION

For the above-stated reasons, Defendants' motion for summary judgment (Dkt. No. 47) is denied as to the following Counts:  II, III, VI, VII, VIII, IX, X and so much of Counts I and IV as assert claims against Colon.  The motion is allowed as to Count V and so much of Counts I and IV as assert claims against Goudreau.  The motion to bifurcate is moot in light of the court's ruling on Count V.

It is so ordered.

Dated:  May 25, 2018                                     /s/ Katherine A. Robertson
                                                        KATHERINE A. ROBERTSON
                                                        UNITED STATES MAGISTRATE JUDGE